Randy WALGAMUTH, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 50A04–0202–CR–55.

Court of Appeals of Indiana.

Oct. 22, 2002.

Publication Ordered Dec. 2, 2002.

Rehearing Denied Dec. 12, 2002.

Transfer Denied Feb. 20, 2003.

June E. Bules, Tom A. Black, Plymouth, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Nandita G. Shepherd, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Randy Walgamuth appeals his conviction for neglect of a dependent as a Class D felony. In particular, he contends that the evidence is insufficient to support his conviction because he had no reason to believe that his mother required medical treatment for her fractured leg. He also contends that the trial court erred when instructing the jury on intent because the instruction created a mandatory presumption which impermissibly shifted the burden of proof to the defense. Because there is evidence in the record that the nurses told Walgamuth on several occasions to take his mother to the emergency room but he waited seven days to do so, we conclude that the evidence is sufficient to support his conviction. Furthermore, because we find that the instruction did not create a mandatory presumption, we

conclude that the trial court did not err in giving it. We affirm.[1]

### Facts and Procedural History

Recently released from a nursing home, Vivian Walgamuth moved into her son Randy Walgamuth's Plymouth, Indiana home so that he could care for her. On January 9, 2001, Carolyn Sharpee, a nurse with the Marshall County/St. Joseph County Visiting Nurses Association, visited Vivian at Walgamuth's house in order to assess her home health care needs, specifically with respect to a hematoma on her right leg and ulcers on both legs. On this visit, Sharpee observed black spots on Vivian's legs as a result of the ulcers and a large and spongy hematoma below Vivian's right knee. Sharpee also noted that Vivian had coffee filters attached to her legs with household tape in order to catch the drainage from the ulcers. Sharpee informed Walgamuth that Vivian needed to go to a doctor or the emergency room. She also told Walgamuth that she was a nurse and any orders would have to come from a doctor. However, Walgamuth responded that he did not want his mother out of his sight. Sharpee therefore left a box of sterile dressings and tape and told Walgamuth to use those supplies as opposed to the coffee filters and household tape.

Sharpee returned the following day and observed black tissue around the perimeter of the ulcers. Despite Sharpee's instructions the previous day, Vivian still had coffee filters attached to her legs with household tape. Sharpee again instructed Walgamuth on the proper way to dress his mother's wounds.

On January 11, another visiting nurse, Pamela Chizum, went to Walgamuth's

---

1. Walgamuth also tenders what he has denominated a pro se "Notice" in which he alleges that the State's brief is "misleading," "erroneous," and "tortiuous" [sic]. Because Walgamuth is represented by counsel in this appeal, we therefore deny his notice.

house. Chizum observed black tissue all over Vivian's ulcers and a hematoma on Vivian's right leg. She also noted that coffee filters were taped to Vivian's legs. Chizum explained to Walgamuth that it was important for him to use sterile dressings, not coffee filters. She also explained to him that he needed to wear gloves and to use antibacterial soap when cleaning the wounds, neither of which he had been doing. Chizum told Walgamuth that he should take his mother to a doctor or the emergency room, but Walgamuth declined.

Sharpee and wound specialist Laura Longnecker went to Walgamuth's house on January 12. This time, Vivian had the household tape on her legs but no coffee filters. Longnecker took pictures of the ulcers and hematoma and decided that she needed to run some tests on Vivian's blood before starting another course of treatment. Sharpee reiterated the wound dressing instructions to Walgamuth.

Chizum returned on January 13, but Walgamuth would not let her see Vivian's legs and then told her to leave. Therefore, she left the house without providing any treatment.

On January 15, Sharpee went back to Walgamuth's house. On this day, Vivian's wounds were open to the air and crusted, as if Walgamuth had not treated them for awhile. Furthermore, Vivian was almost comatose. However, Sharpee left after checking Vivian's vitals but before providing any treatment because she "didn't feel real safe" in Walgamuth's presence because he had a gun on the table. Tr. p. 78.

The following morning Walgamuth called Sharpee and expressed concern about Vivian's health because she had become unconscious twice during the night. Sharpee told Walgamuth that it was important to get Vivian to a doctor today, and he responded that he was taking her to the emergency room at 10:00 a.m. that morning. Sharpee visited Vivian in the emergency room later that afternoon and noticed that her lower right leg was deformed. When Sharpee asked Vivian what happened, she responded that Walgamuth had twisted her leg.

Dr. Rod Kubley, Vivian's primary care physician, visited her in the hospital later that same afternoon and was concerned about the deformity in her lower right leg. Dr. Kubley ordered an x-ray, which showed that Vivian had two open fractures. Dr. Kubley then consulted Dr. Nathan Fogt, an orthopedic surgeon. Dr. Fogt saw Vivian on January 17. He inspected the hematoma, which he concluded was "secondary to the fracture." Tr. p. 216. He also observed that healing tissue was already forming around the fractures. As a result, he opined that the fractures were seven to ten days old. Tr. p. 222. After consultation with general surgeon Dr. David Reitter, the two doctors decided that Vivian's right leg would have to be amputated because the leg was severely infected as a result of being left untreated for too long. Tr. p. 227. Dr. Reitter opined that a person with an open fracture should get medical treatment, including antibiotics and surgery, within six hours of the injury and that if Vivian had received treatment even six to seven days earlier, the amputation would have been "less likely." Tr. p. 227, 244.

Adult Protective Services contacted Officer Ward Byers of the Marshall County Sheriff's Department concerning Walgamuth's possible elder abuse of Vivian. Officer Byers interviewed Vivian and the visiting nurses who treated her. Following his investigation, Officer Byers arrested Walgamuth. The State subsequently charged Walgamuth with Aggravated Bat-

tery as a Class B felony[2] and Neglect of a Dependent as a Class D felony.[3] The State also alleged that he was a habitual offender. After a jury trial, Walgamuth was convicted of neglect of a dependent but acquitted of aggravated battery. Following the habitual offender phase of trial, Walgamuth was also adjudicated a habitual offender. The trial court sentenced him to an aggregate term of seven and a half years. This appeal followed.

### Discussion and Decision

Walgamuth raises two issues on appeal. First, he contends that the evidence is insufficient to support his conviction of neglect of a dependent. Next, he contends that the trial court erred when instructing the jury on intent. We address each issue in turn.

### I. Sufficiency of the Evidence

 Walgamuth first contends that the evidence is insufficient to support his conviction of neglect of a dependent. Specifically, Walgamuth argues that he had no reason to believe that his mother required medical treatment for her fractured leg. When reviewing the sufficiency of the evidence, we neither reweigh the evidence nor judge witness credibility. *James v. State*, 755 N.E.2d 226, 229 (Ind.Ct.App. 2001), *trans. denied.* Instead, we examine only the evidence favorable to the judgment, together with the reasonable inferences to be drawn therefrom. *Id.*

The State charged Walgamuth with neglect of a dependent and specifically with "having the care of Vivian Walgamuth, a dependent, [and] knowingly plac[ing] said dependent in a situation that may have endangered the dependent's life or health, to-wit: failed to obtain proper medical treatment for the broken leg of Vivian Walgamuth." Appellant's App. p. 15.

Thus, in order to convict Walgamuth of neglect of a dependent, the State was required to prove that Walgamuth had the care of Vivian, which was assumed either voluntarily or because of a legal obligation, and knowingly or intentionally placed Vivian in a situation that endangered her life or health. Ind.Code § 35–46–1–4(a)(1).

Walgamuth's argument on this issue focuses on the fact that none of the visiting nurses told him that his mother's leg was fractured and therefore he had no reason to believe that she needed medical treatment for her leg. However, this argument overlooks the following key evidence that the State presented at trial: (1) according to Dr. Fogt's timeline, Vivian's fractures occurred between January 7 and January 10, when she was in Walgamuth's exclusive care; (2) the fractures caused the hematoma on Vivian's lower right leg, which the nurses treated from January 9 to January 15 in addition to the ulcers; and (3) the nurses told Walgamuth as early as January 9 that his mother needed to go to a doctor or the emergency room, but he did not take her to the emergency room until January 16. In addition, the State presented evidence that when the nurses visited Vivian on both January 13 and January 15, Walgamuth effectively prevented them from treating his mother's leg. From this evidence, the jury could have reasonably concluded that Walgamuth failed to obtain proper medical treatment for his mother's fractured leg. Therefore, we conclude that the evidence is sufficient to support his conviction.

### II. Jury Instruction

 Walgamuth next contends that the trial court erred when instructing the jury that it "*may infer* from all the surrounding circumstances what the intent of

---

**2.** Ind.Code § 35–42–2–1.5(2).

**3.** Ind.Code § 35–46–1–4(a)(1).

the defendant was at the time an act was committed."[4] Appellant's App. p. 51 (emphasis added). Specifically, Walgamuth argues that the instruction created a mandatory presumption which impermissibly shifted the burden of proof to the defense in violation of the Due Process Clause. Although Walgamuth asserts on appeal that this issue should be analyzed under the fundamental error doctrine because he objected on a different ground at trial, we nevertheless find that Walgamuth objected on the same ground at trial. *See* Tr. p. 323–25. As such, we will analyze this issue under the abuse of discretion standard.

■■■ Jury instructions are within the discretion of the trial court and will be reversed only upon a showing of an abuse of that discretion. *Geiger v. State,* 721 N.E.2d 891, 894 (Ind.Ct.App.1999). The purpose of instructions is to inform the jury of the law applicable to the facts of the particular case. *Clark v. State,* 732 N.E.2d 1225, 1230 (Ind.Ct.App.2000). To be erroneous, the instructions must either as a whole misstate the law or otherwise mislead the jury. *Id.*

■■■ "A jury instruction will be found to violate the Fourteenth Amendment where it is reasonably likely that the jury interpreted the instruction as shifting to the defendant a burden of persuasion on the intent element." *Winegeart v. State,* 665 N.E.2d 893, 903 (Ind.1996). Our threshold inquiry is to determine whether the challenged jury instruction created a mandatory presumption or merely a permissive inference. *Id.* at 903–04. "A mandatory presumption instructs the jury that it *must* infer the presumed facts if the

State proves certain predicate facts." *Id.* at 904 (emphasis added) (quotation omitted). On the other hand, "[a] permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." *Id.* (quotation omitted). Furthermore, phrases such as "may infer," "may look to," and "may consider" create permissive inferences, not mandatory presumptions. *Id.* Because the jury instruction at issue here utilized the phrase "may infer," it did not create a mandatory presumption. Therefore, the trial court did not abuse its discretion in giving it.

Judgment affirmed.

BAKER, J., and BARNES, J., concur.

## *ORDER*

This Court having heretofore handed down its opinion in this appeal on October 22, 2002, marked Memorandum Decision, Not for Publication.

Comes now the Appellee, by counsel, and files herein Verified Motion for Publication of Memorandum Decision, alleging therein that said decision involves a factual issue of unique interest and substantial public importance and clarifies an existing rule of law and provides guidance and clarity in the adjudication of cases involving neglect of a dependent when that dependent is an elderly adult.

The Court having examined said Motion, having reviewed its opinion in this case, and being duly advised, now finds that the Appellee's Motion for Publication of Memorandum Decision should be granted and

---

**4.** This instruction also provided that "[t]he law does not require a direct statement of intent by a defendant to prove the intent to commit a particular crime." Appellant's App. p. 51. To the extent that Walgamuth argues that this part of the instruction inappropriate-ly commented on his right not to testify, he has waived this issue for failing to present a cogent argument and authority in support. *Diaz v. State,* 753 N.E.2d 724, 728 n. 4 (Ind. Ct.App.2001), *trans. denied.*

this court's opinion in this appeal should now be ordered published.

IT IS THEREFORE ORDERED as follows:

1. The Appellee's Verified Motion for Publication of Memorandum Decision is granted and this Court's opinion heretofore handed down in this appeal on October 22, 2002, marked Memorandum Decision, Not for Publication, is now ordered published.