Jeremiah BEVERLY, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0304–CR–298.

Court of Appeals of Indiana.

Jan. 22, 2004.

Transfer Denied April 23, 2004.

Kathleen M. Sweeney, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Matthew D. Fisher, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Jeremiah "Jerry" Beverly appeals his convictions for voluntary manslaughter and carrying a handgun without a license. The victim's statement to a paramedic at the scene of the crime that Beverly shot him was properly admitted as a dying declaration where the victim suffered a single gunshot wound to the back of his head while driving his car and was slumped over and in a decreased state of consciousness. Furthermore, the deputies had reasonable suspicion to stop Beverly because several people called 911 with generally the same information about the shootings, thereby corroborating each other. Lastly, the evidence is sufficient to support Beverly's conviction for voluntary manslaughter because he fired shots at the victim's car while engaged in a high speed chase, retrieved a second gun when his first gun ran out of bullets, and then fired more shots, this time shooting the victim in the back of the head.

### Facts and Procedural History

The facts most favorable to the verdict reveal that on November 9, 2001, Beverly pulled his gold GMC Yukon into the parking lot of the Creekwood Apartments on the northwest side of Indianapolis, where he lived off and on with his girlfriend. As Beverly walked away from his Yukon, a blue-gray older model Oldsmobile, driven by Tony Robinson, pulled in behind it. Although the facts are unclear about what transpired next, it appears that a passenger in Robinson's Oldsmobile, who was never identified, exited the Oldsmobile, and shots were exchanged between the unidentified passenger and Beverly. As the unidentified passenger started running away, Beverly fired two more shots in his direction. Robinson then sped off in his Oldsmobile, and Beverly jumped into his Yukon and followed him.

After exiting the apartment complex, Beverly chased Robinson south on Michigan Road. Joseph Gianforte, a motorist traveling southbound on Michigan Road at the same time, heard popping noises and then observed a "golden-colored SUV"

closely following an "old looking car.". Tr. p. 202. As the cars passed him, Gianforte saw the driver of the SUV "hanging out of his driver's side window holding a gun and firing it" at the older car. Tr. p. 203. Charles Smith was also traveling southbound on Michigan Road around the same time when he heard three "pops." Tr. p. 184. He then heard a single pop to his left as a "[b]lond" or "brown" SUV passed him. Tr. p. 185. After the SUV passed him, Smith observed the driver of the SUV "leaning or hanging out the window." Tr. p. 186.

Anthony Smith, Jr., who knew Beverly from high school, was driving north on Michigan Road in his Chevrolet Caprice when he saw Beverly driving south in his Yukon. Beverly waved to Anthony, so Anthony followed him. Anthony eventually pulled his Caprice alongside Beverly's Yukon as both cars were traveling southbound on Michigan Road, and Beverly asked Anthony if he had his gun with him. Anthony then passed his revolver to Beverly through the car windows. Anthony stopped at a gas station, and Beverly drove on.

Thereafter, witnesses observed the Oldsmobile driven by Robinson, which was being pursued by another car, collide with a third car at the intersection of Michigan Road and Kessler Boulevard. Robinson then crashed into two other cars and landed in a ditch. Witnesses also saw a gold SUV in the vicinity of the crash.

Beverly eventually returned to the gas station where Anthony was waiting, exited his Yukon, and entered Anthony's Caprice. Beverly then instructed Anthony to drive "to a certain spot on Michigan Road," where Anthony observed a car with bullet holes in the rear windshield in the ditch. After Beverly confirmed that Robinson was still in the car, Anthony drove him back to the gas station where he left his Yukon. After Beverly exited Anthony's car, Anthony observed two guns on the seat, the one he had given Beverly and another one.

Thomas Adams, a firefighter/paramedic with the Washington Township Fire Department, arrived at the intersection of Michigan Road and Kessler Boulevard and discovered Robinson slumped over in his car. Adams asked Robinson, who was in a "decreased" state of consciousness and "lethargic," if he had been shot. Tr. p. 395. When Robinson did not respond, Adams more forcefully asked, "Who shot you?" Tr. p. 397. This time, Robinson responded, "Jerry shot me." Tr. p. 397. As Adams was removing Robinson from his car, he noticed a gunshot wound to the back of Robinson's head. Robinson was then taken to the hospital, where he died the next day from the gunshot wound.

Marion County Sheriff's Deputies Debora Oatis and Dennis Nike received a dispatch of a "shots fired call" involving a gold, full-size SUV driven by a light-skinned black male that was in the vicinity of Michigan Road and 71st Street. Tr. p. 283. Specifically, dispatch "had received numerous phone calls over a matter of maybe five or six minutes saying that this vehicle was driving up and down Michigan Road shooting," and dispatch had relayed that information to the deputies. Tr. p. 284. When Deputies Oatis and Nike arrived at Michigan Road and 71st Street, they observed a gold SUV pull into a gas station and stopped it. Beverly then "jumped out of" his Yukon and started walking toward the deputies yelling and waving his arms. Tr. p. 290. Beverly stated that "someone was trying to kill his girlfriend.... They're shooting at her." Tr. p. 291. Eventually, the deputies handcuffed Beverly. When Sergeant Scott Scales from the Marion County Sheriff's Department arrived on the scene, he read

Beverly his *Miranda* rights and then questioned him. Beverly told Sergeant Scales that "somebody tried to carjack him. There was a chase that ensued. They shot at him[.]" Tr. p. 250. Beverly also explained that his friend gave him a gun, and then he fired the gun at the other vehicle and returned it to his friend.

The State subsequently charged Beverly with murder and carrying a handgun without a license as a Class C felony. Before trial, Beverly filed a motion to suppress the statements he made to the deputies during the investigatory stop and a motion in limine to exclude Robinson's statement to the paramedic that Beverly had shot him. After a hearing, the trial court denied both motions. After a bench trial, the trial court found Beverly guilty of Voluntary Manslaughter as a Class A felony [1] as a lesser-included offense of murder and Carrying a Handgun Without a License as a Class C felony [2] and sentenced him to an aggregate sentence of forty years with five years suspended. This appeal ensued.

## Discussion and Decision

Beverly appeals his convictions raising three issues. First, he contends that the trial court erred in admitting Robinson's statement to the paramedic into evidence because it constitutes inadmissible hearsay. Second, Beverly contends that the trial court erred in admitting the statements he made to deputies during the investigatory stop into evidence because the deputies did not have reasonable suspicion to stop him in the first instance. Third, Beverly contends that the evidence is insufficient to support his conviction for voluntary manslaughter because he did not knowingly or intentionally kill Robinson. We address each issue in turn.

## I. Hearsay

Beverly contends that the trial court erred in admitting Robinson's statement to the paramedic that "Jerry shot me" into evidence because it constitutes inadmissible hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Hearsay is generally not admissible at trial. Evid. R. 802. Because Robinson's statement was offered to prove that Beverly shot him, it constitutes hearsay and is therefore inadmissible unless it falls under an exception to the hearsay rule.

Here, at the hearing on Beverly's motion in limine, the State argued that Robinson's statement was admissible either as a dying declaration pursuant to Indiana Evidence Rule 804(b)(2), an excited utterance pursuant to Rule 803(2), or a statement for purposes of medical diagnosis or treatment pursuant to Rule 803(4). The trial court ultimately denied the motion in limine because it found that Robinson's statement qualified as one for purposes of medical diagnosis or treatment. However, the trial court did not state whether the two other exceptions applied as well. On appeal, Beverly argues that Robinson's statement does not qualify as a statement for purposes of medical diagnosis or treatment. The State apparently concedes this point and instead argues that Robinson's statement is admissible as a dying declaration.[3] We first examine whether Robinson's statement qualifies as one for purposes of medical diagnosis or treatment.

---

1. Ind.Code § 35–42–1–3(a)(2).

2. Ind.Code §§ 35–47–2–1(a), –23(c)(2).

3. Although the State argued before the trial court that the statement was admissible as an excited utterance, it does not advance this argument on appeal; therefore, we do not address this exception.

In order for a hearsay statement to be admissible as a statement made for purposes of medical diagnosis or treatment, the following elements must be established: (1) it must be made for the purpose of medical diagnosis or treatment; (2) it must describe medical history, symptoms, pain, sensations, or the inception or general character of the cause or external source; and (3) it must be reasonably pertinent to diagnosis or treatment. Ind. Evidence Rule 803(4); *Nash v. State*, 754 N.E.2d 1021, 1023 (Ind.Ct.App.2001), *trans. denied.* Hearsay is admitted under this exception because the reliability of the out-of-court statement is assured based upon the belief that the declarant's self-interest in seeking medical treatment renders it unlikely that he will mislead the person that he wants to treat him. *Id.* The underlying rationale for this hearsay exception requires a two-step analysis for evaluating whether a statement is properly admitted pursuant to Rule 803(4):(1) whether the declarant is motivated to provide truthful information in order to promote diagnosis and treatment; and (2) whether the content of the statement is such that an expert in the field would reasonably rely upon it in rendering diagnosis or treatment. *Id.* at 1023–24. As for the second step, hearsay statements admissible for the purpose of medical diagnosis or treatment typically do not involve statements of identity because identity of the person responsible for the injury is usually not necessary to provide effective medical care. *Id.* at 1024. Although there are exceptions to this general rule, such as where injury occurs as the result of domestic violence, *see id.* at 1025, none of them apply to the facts of this case. Robinson's statement does not qualify as a statement for purposes of medical diagnosis or treatment. However, we will only reverse a trial court's hearsay ruling for an abuse of discretion, and we will affirm the ruling on any legal basis apparent in the record. *Ross v. State*, 676 N.E.2d 339, 345 (Ind.1996); *Jones v. State*, 800 N.E.2d 624 (Ind.Ct.App.2003). We now proceed to determine whether Robinson's statement qualifies as a dying declaration.

Indiana Evidence Rule 804(b)(2) provides, "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: ... A statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." The two reasons typically given for admitting such statements into evidence are: (1) to bring to justice murderers who otherwise might escape the penalty of the law because the victims of their crimes are not available to testify; and (2) the dying declaration is reliable because of the belief that a person about to die is less likely to fabricate the guilt of an innocent person than one who would stand to derive some benefit from his falsehood. Ferdinand S. Tinio, Annotation, *Sufficiency of Showing of Consciousness of Impending Death, by Circumstances Other Than Statements of Declarant, to Justify Admission of Dying Declaration*, 53 A.L.R.3d 1196, 1201 (1973). Since the Indiana Rules of Evidence were adopted in 1994, there have been no cases substantively addressing this exception to the hearsay rule. We turn to pre-Indiana Rules of Evidence cases for guidance.

Under the dying declaration exception, the fact that a victim ultimately dies from her injuries does not make her statement admissible; rather, the victim must have known that death was imminent and abandoned all hope of recovery. *Anderson v. State*, 471 N.E.2d 291, 292 (Ind.1984). In *Anderson*, the defendant stabbed the victim in her side and took her purse. The victim, who eventually died

from the knife wound, told eyewitnesses that two men took her purse. She also told eyewitnesses that she was all right and did not need an ambulance. At trial, the trial court permitted the eyewitnesses to testify that the victim told them that two men had taken her purse. Because of the victim's statements that she was all right and did not need an ambulance, the supreme court concluded that her statements did not fall within the dying declaration exception. *Id.* Furthermore, in order to prove that the victim knew that death was imminent and had abandoned all hope of recovery, we can resort to "the general statements, conduct, manner, symptoms, and condition of the declarant, which flow as the reasonable and natural results from the extent and character of his wound, or state of his illness." *Williams v. State,* 168 Ind. 87, 79 N.E. 1079, 1081 (1907), *superseded on other grounds by rule as stated in Jackson v. State,* 712 N.E.2d 986 (Ind.1999); *see also Gipe v. State,* 165 Ind. 433, 75 N.E. 881, 882 (1905) ("[I]f a dying person either declare[s] that he knows his danger, or it is reasonably to be inferred from the wound or state of illness that he was sensible of his danger, the declarations are good evidence. That the character of the wound may of itself warrant the inference that the declarant was under a sense of certain and speedy death is settled upon the authorities[.]") (quotation omitted).

■ Here, the evidence shows that Robinson suffered a single gunshot wound to the back of his head while driving his car and collided with three cars before coming to rest in a ditch. When paramedic Adams came to his aid minutes later, Robinson was slumped over, looked like he was asleep, was lethargic, and was in a decreased state of consciousness. Consequently, Adams' questioning of Robinson "had to be kind of forceful in nature" to elicit responses. Tr. p. 395. Robinson was then taken to the hospital, where he died from the gunshot wound the next day. It can be inferred from the nature of the gunshot wound and his decreased level of consciousness that Robinson knew death was imminent and had abandoned all hope of recovery. Robinson's statement concerning the circumstances of his impending death was admissible as a dying declaration pursuant to Indiana Evidence Rule 804(b)(2).[4] The trial court did not abuse its discretion in admitting Robinson's statement into evidence.

## II. Reasonable Suspicion

■ Beverly next contends that the various 911 calls that shots were being fired from a gold SUV driven by a black male at a particular location did not give the deputies reasonable suspicion to conduct an investigatory stop of him because there was "no way to test the anonymous callers' reliability," Appellant's Br. p. 12; therefore, the trial court erred in admitting the statements he made to deputies during the investigatory stop into evidence.[5] A trial court has broad discretion in ruling on the admissibility of evidence, and we will disturb its ruling only where it is shown that the trial court abused that discretion. *Ware v. State,* 782 N.E.2d 478, 481 (Ind.Ct.App.2003), *reh'g denied.*

4. The fact that the record reveals that Robinson may have briefly stabilized once arriving at the hospital does not impact our decision as those are acts subsequent to Robinson's dying declaration.

5. Although Beverly frames his argument as the trial court erred in denying his motion to suppress, the real issue is whether the trial court erred in admitting his statements into evidence at trial. *See Washington v. State,* 784 N.E.2d 584, 586 (Ind.Ct.App.2003).

The Fourth Amendment to the United States Constitution provides, in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. Pursuant to the Fourteenth Amendment of the United States Constitution, individual states must provide their citizens with the protections afforded by the Fourth Amendment.[6] *State v. Eichholtz*, 752 N.E.2d 163, 165 (Ind.Ct.App.2001).

■■■■ The United States Supreme Court created an exception to the Fourth Amendment's requirement that a police officer have probable cause or a warrant before stopping a person in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Pursuant to *Terry*, a police officer may briefly detain a person for investigational purposes if the officer has reasonable suspicion, based on specific and articulable facts, "that criminal activity may be afoot." *Id.* at 30, 88 S.Ct. 1868. "Reasonable suspicion consists of a minimal level of objective justification for making a stop that is more than an inchoate and unparticularized suspicion or hunch." *Eichholtz*, 752 N.E.2d at 165 (quotations omitted). "Whether the officer's suspicion was reasonable is determined on a case-by-case basis by engaging in a fact-sensitive analysis of the totality of the circumstances." *Id.*

■■■■ As a general rule, an anonymous tip alone is not likely to constitute the reasonable suspicion necessary for a valid *Terry* stop. *Lampkins v. State*, 682 N.E.2d 1268, 1271 (Ind.1997) (citing *Alabama v. White*, 496 U.S. 325, 329–330, 110

S.Ct. 2412, 110 L.Ed.2d 301 (1990)), *modified on reh'g on other grounds*, 685 N.E.2d 698 (Ind.1997). However, "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (quotation omitted). Specifically,

> [A]n anonymous telephone tip, absent any independent indicia of reliability or any officer-observed confirmation of the caller's prediction of the defendant's future behavior, is not enough to permit police to detain a citizen and subject him or her to a *Terry* stop and the attendant interruption of liberty required to accomplish it.

*Washington v. State*, 740 N.E.2d 1241, 1246 (Ind.Ct.App.2000), *trans. denied.* Beverly, who does not dispute this authority, contends that *Berry v. State*, 766 N.E.2d 805 (Ind.Ct.App.2002), *trans. denied*, controls the present case.

In *Berry*, a Marion County Sheriff's Deputy was dispatched to a Burger King due to a reported disturbance. An anonymous caller reported to the dispatcher that a suspect had produced a firearm and had waved it around in the parking lot. The caller also reported that the suspect had told individuals before he left the parking lot that he was going to "cap someone." *Id.* at 806. The caller described the suspect as a white male in a green jacket driving an S10 Blazer and provided a partial license plate number. Minutes later and approximately six blocks away from the Burger King, the deputy pulled over an S10 Blazer, which had six out of seven

---

6. Although Beverly also challenges the investigatory stop under Article I, § 11 of the Indiana Constitution, "[w]e have interpreted the protections provided by Article I, § 11 of the Indiana Constitution regarding investiga-

tory stops to be consistent with federal interpretation of protections provided by the Fourth Amendment to the United States Constitution." *Washington v. State*, 740 N.E.2d 1241, 1246 (Ind.Ct.App.2000), *trans. denied.*

matching numbers on the license plate, driven by Berry.

On appeal, this Court held that the deputy improperly stopped Berry because the stop was based solely on an anonymous tip that lacked sufficient indicia of reliability. *Id.* at 810. Specifically, the deputy did not observe any activity that would have provided an independent basis or reasonable suspicion for stopping Berry. *Id.* Additionally, the anonymous caller failed to provide any predictions of Berry's future behavior that would establish that he or she had inside knowledge of Berry's affairs. *Id.*

■■ The present case is readily distinguishable from *Berry*. Here, Deputies Oatis and Nike received reports from dispatch that a "gold, full-size SUV driven by a black male" was involved in a shooting and was near Michigan Road and 71st Street. Tr. p. 284. Dispatch broadcasted these reports based on numerous 911 calls that had been made within five or six minutes reporting that the SUV "was driving up and down Michigan Road shooting." Tr. p. 284; *see also* Tr. p. 33. Although Deputies Oatis and Nike did not hear the actual 911 calls, they heard the information that dispatch broadcasted concerning those calls. Deputy Oatis explained the following at the suppression hearing:

[Deputy Nike and I] received in a matter of probably five, six minutes or so, we received probably ten or twelve updates where a different dispatcher, they were getting a phone call and they would hit in and say report of shots fired. One time it was southbound on Michigan Road from 71st, one time it was northbound on Michigan Road, eastbound on Westlane from Michigan Road, southbound on Township Line, they were just all over in the general area of 71st and Michigan.

Tr. p. 16.

Unlike *Berry*, where there was a single anonymous caller, here several people called 911 concerning shots being fired from a specific car at a specific location.[7] Although the deputies did not observe any activity that would have provided an independent basis or reasonable suspicion for stopping Beverly and the callers failed to provide any predictions of Beverly's future behavior, the calls bear independent indicia of reliability because they corroborate each other in regards to the fact that shots were being fired and to the general description of the car, driver, and their location. *See United States v. Schaefer,* 87 F.3d 562, 566 (1st Cir.1996) ("Courts often have held that consistency between the reports of two independent informants helps to validate both accounts."). Because Deputies Oatis and Nike had reason-

---

7. We listened to State's Exhibit 52, which is a copy of the 911 calls made concerning the shootings and car accident. Specifically, the tape contains twelve calls, five of which address the shootings. Of those five calls, one person gave his name and location from which he was calling and another person gave the location from which she was calling but no name. However, neither of these two people witnessed the shootings; rather, they were instructed by other people to call 911. Two of the remaining three callers gave general personal identifying information but nothing specific such as name or location from which they were calling. We observe that the fact that the callers did not give more specific personal identifying information is more a product of not being asked by the 911 operators as opposed to intentionally withholding such information. Given the unique facts of this case, we do not decide whether any of these callers would not be considered anonymous because they "identified [themselves] to the 9–1–1 operator in such a manner that [they] could be held legally responsible" if the deputies' investigation revealed that they filed a false police report. *Eichholtz,* 752 N.E.2d at 167 (citing Ind.Code § 35–44–2–2).

able suspicion to stop Beverly, the trial court did not abuse its discretion in admitting Beverly's statements to the deputies during the investigatory stop into evidence.

### III. Sufficiency of the Evidence

 Lastly, Beverly contends that the evidence is insufficient to support his conviction for voluntary manslaughter. When reviewing the sufficiency of the evidence, we neither reweigh the evidence nor judge witness credibility. *Walgamuth v. State,* 779 N.E.2d 533, 536 (Ind.Ct.App. 2002), *reh'g denied, trans. denied.* Instead, we examine only the evidence most favorable to the judgment together with the reasonable inferences to be drawn therefrom. *Id.* We will affirm if there is substantial evidence of probative value to support the conclusion of the trier of fact. *Johnson v. State,* 785 N.E.2d 1134, 1141 (Ind.Ct.App.2003), *trans. denied.*

To convict Beverly of voluntary manslaughter as a Class A felony in this case, the State must have proved that Beverly knowingly or intentionally killed Robinson while acting under sudden heat and by means of a deadly weapon. Ind.Code § 35–42–1–3(a)(2). On appeal, Beverly argues that the State failed to prove that he acted knowingly or intentionally. Instead, Beverly proposes that "[i]t could only have been bad luck that [he], driving at a high rate of speed, hanging out a window, could have fired a shot that penetrated Robinson in the back of his head." Appellant's Br. p. 16.

 Here, the evidence shows that Beverly exchanged gunfire with an unidentified passenger in Robinson's car in the parking lot of Creekwood Apartments, chased Robinson down Michigan Road, and fired shots at Robinson's car while leaning out his car window. And when Beverly's gun ran out of bullets, he stopped a high school friend, borrowed his

gun, and fired more shots at Robinson's car, this time shooting Robinson in the back of the head. The trial court did not err in concluding that Beverly's conduct was not bad luck but instead constituted a knowing or intentional killing of Robinson. Beverly's argument is simply an invitation for this Court to reweigh the evidence, which we cannot do. The evidence is sufficient to support Beverly's conviction for voluntary manslaughter.

Judgment affirmed.

BAILEY, J., concurs.

KIRSCH, J., dissents with separate opinion.

KIRSCH, Judge, dissenting.

I respectfully dissent from the decision of the majority holding that the statement made by the victim to the paramedic ("Jerry shot me") is admissible as a dying declaration as a matter of law because I do not believe that the evidence here leads solely to the conclusion that the victim knew that death was imminent and had abandoned all hope of recovery. I believe the majority impermissibly invades the province of the trial court in making what I believe is a factual determination.