**Michael B. SMITH, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 07A05–0701–CR–50.

Court of Appeals of Indiana.

Aug. 4, 2008.

Transfer Denied Oct. 23, 2008.

Kurt A. Young, Nashville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

Michael B. Smith appeals his conviction of murder, arguing evidence was admitted in violation of Ind. Evidence Rule 404(b) and the evidence was insufficient to support his conviction. We affirm.

## FACTS AND PROCEDURAL HISTORY

At about 3:00 a.m. on November 9, 2003, Michael placed a 911 call. He told the dispatcher he had found his wife, Linda, face down in their hot tub. He said Linda had gone to the hot tub around 10:30 p.m., while he took a shower and fell asleep. He woke up shortly before 3:00 a.m. and realized Linda was not in the house, so he looked for her in the "spa building" where the hot tub was located. Michael said Linda was not breathing and he would have to set down the phone to lift her out of the water. When Michael got back on the phone, the dispatcher asked him if he knew how to administer CPR. Michael said he had taken some classes a few years earlier, but water was coming out of Linda's mouth. The dispatcher instructed Michael to place Linda on her side to get the water out and then attempt CPR.

The First Responders arrived at 3:17 a.m.[1] Robert VanDevander was first on the scene. As he approached the spa building, he could see Michael through a window. When Michael saw VanDevander, he moved towards Linda and "made like he was doing CPR compressions but at a real . . . severe angle." (Tr. at 2048.) Michael was looking at VanDevander "while he was doing it . . . in a real fast motion, at an angle, not straight up and down, you know." (*Id.*)

VanDevander checked for a pulse and tried to open Linda's mouth. VanDevander could not get Linda's mouth open, but another First Responder, Christopher Ainsworth, attempted to force oxygen into her using a bag valve mask. First Responder Arlan Pierce performed CPR. Paramedic Joan Stephens arrived a few minutes later and started an IV. Linda was not responding to the efforts to revive her, and it appeared she had been dead for a while. Stephens called an emergency room doctor, who informed them they had done everything possible and should stop resuscitation.

Officers Dan Huesman and Manuel Pantoja arrived. Officer Pantoja took pictures in the spa building, and Officer Huesman took a statement from Michael. Michael stated Linda had been cleaning the house all day and was tired. Michael said Linda

---

1. The First Responders are members of the fire department. They do not have all the qualifications of EMTs, but can offer some basic emergency medical assistance, such as CPR. The First Responders can often reach remote locations more quickly than EMTs.

had heart palpitations a few weeks earlier and had been very quiet about her health problems.

Brown County Coroner Earl Piper examined Linda's body and found a hemorrhage inside one eye and some bruising near the eye, but no other injury. Michael told Piper that Linda had been working around the home that day. That evening, they ordered a pizza. After he exercised and showered, they ate, and he fell asleep. He woke up around 3:00 a.m. and went looking for Linda. As to Linda's medical condition, Michael said she had complained of a slight headache throughout the week. Recently, she had often appeared sleepy, and two or three weeks prior, he found her asleep on the bathroom floor. Both her parents had died of heart conditions. Michael also volunteered information about Linda's drinking habits. She had received treatment in the 1980s and had been in two accidents. They had received notice of a lawsuit. However, he did not think she had any alcohol that week.

Piper took Linda's body to the Columbus Regional Hospital morgue. The next morning, Piper returned to the hospital to attend the autopsy. When Linda's body was removed from the cooler, Piper noticed additional injuries that he had not seen the previous day. After conferring with a pathologist at the hospital, Piper transported Linda's body to the IU Forensic Pathology office for a forensic autopsy.

Dr. Dean Hawley conducted the autopsy and concluded the manner of death was homicide and the cause of death was strangulation. When a person is strangled by compressing the jugular veins, blood vessels in the head become over-inflated with blood, and the smaller vessels will burst, leaving petechiae. (*Id.* at 2915.) When petechiae are caused by strangulation, they are found only in the head. (*Id.* at 2942.) When they are caused by some-

thing else, they can be found throughout the body. (*Id.* at 2941.) Dr. Hawley found petechiae only on Linda's scalp. (*Id.* at 2938.)

Dr. Hawley discovered extensive injury to Linda's neck. The muscle had been pulled away from the bone on the left side, and her larynx was pushed backward into the muscle. (*Id.* at 2927–28.) There were also injuries to Linda's lips and nose. Dr. Hawley, an expert on strangulation, explained this combination of injuries

> sometimes represents a mechanics of causation where..[.] the mouth is forced closed, pushing the lips back against the teeth and the nose is pinched closed to cut off external breathing.... [I]njuries of the nose and lips are commonly seen in people who have fatal strangulation.

(*Id.* at 2949–50.)

Dr. Hawley examined Linda's heart, lungs, stomach, liver, and brain, and found no abnormalities. Dr. Hawley found no swallowed water in Linda's lungs or stomach. Although a person can drown without swallowing water, Dr. Hawley explained that generally occurs only if a person has been promptly removed from the water. If a person has "been submerged for a few hours in water," Dr. Hawley "would generally expect to find quite a bit of" water. (*Id.* at 2961.) Dr. Hawley found no evidence of a seizure, heart disease, or high blood pressure.

The toxicology report contained nothing that would account for Linda's death. Low levels of Darvocet, a pain medication, were found in Linda's blood. The amount was below therapeutic levels, indicating she had not taken a large dose before she died. Her blood alcohol concentration was .026%, which could have corresponded to one drink or natural fermentation of her blood after death.

The injuries to Linda's neck, mouth, and nose "in conjunction with petechiae under the scalp, the hemorrhage into the eye and the absence of findings of toxic substances in the body, the absence of other fatal injuries or natural diseases" indicated Linda had been strangled. (*Id.* at 2951.) Dr. Hawley believed a scenario involving multiple falls and drowning in the hot tub "would be a very far fetched string of coincidences." (*Id.* at 2979.)

With respect to Linda's health prior to her death, Linda had visited Trafalgar Family Health Center on several occasions between November of 1998 and May of 2003. Lisa Merrero, a certified family nurse practitioner, testified concerning Linda's records at the health center. Linda had never complained of heart problems. Her vital signs were monitored when she came in for appointments, and there was no indication she had heart problems. At the time of her last appointment, Linda was taking Clonidine (for menopause symptoms), Darvocet, Intex (for sinus congestion), Mirapex (for restless leg syndrome), and Zoloft (for depression). She had never complained of any side effects from the drugs.

Detective Steve Brahaum led the investigation into Linda's death, which began to focus on Michael. Detective Brahaum noted:

> On the 911 call ... you don't hear water splashing. You don't hear the sounds as if somebody is pulling and tugging on a body like grunting and groaning. And you don't hear a thud or a thump of a body as its [sic] being pulled from the tub onto the floor.

(*Id.* at 3092–93.) Detective Brahaum and First Responders Arlan, VanDevander, and Ainsworth all noticed Linda's body was placed perfectly centered on an exercise mat and was covered by a towel that was laid neatly across her.

Arlan noticed he did not get wet when he knelt down to try to resuscitate Linda. He felt the carpet between the hot tub and the mat, and it was dry. He noticed some drops of water on the lip of the hot tub, but the steps and sides appeared dry. Linda's body was dry, and although her hair looked wet, he noticed it was spiked, and likely had gel or mousse in it. VanDevander, Ainsworth, and Karen Pierce (another First Responder) also noticed a lack of water and thought Linda's hair might have gel or mousse in it. First Responder David Carlisle did not get wet when he knelt down to check Linda's feet for circulation, and her feet were not wet. Carlisle noticed a little water around the top of the hot tub and "there wasn't a whole lot of water on the floor." (*Id.* at 2243.) He thought her hair looked damp, but it could have been mousse or gel. Piper did not see any spilled water in the room. He thought Linda's hair "had shown signs of being wet but ... it was no more than damp." (*Id.* at 2333.) Paramedics Jennifer Anderson and Stephens noticed a little water on the edge of the hot tub. Stephens recalled seeing water on the steps as well, but she did not get wet while trying to resuscitate Linda. Stephens thought Linda's hair looked wet. Officer Pantoja noticed the carpet was not wet, and he did not see any water around the hot tub. He did not find any signs of forced entry into the spa building.

Arlan, Pierce, and Piper noticed Michael's clothing was not wet. Pierce escorted Michael out of the spa building and into the house. Pierce asked him if he wanted to call anyone, but he was reluctant to do so. Eventually, Michael agreed to call his neighbors, Richard and Rebecca Baugh. The Baughs came over and sat with Michael for a while. The Baughs thought Michael's shirt looked damp from sweat; the room they were in had a fire-

place and was very warm. Richard did not think Michael's pants or socks looked wet. Rebecca noticed Michael's demeanor was "fairly relaxed," and although he "occasionally would dab at his eyes," "he didn't really have any tears." (*Id.* at 2187.) She suggested that Michael call Linda's family members, but he did not want to call them. Eventually, he asked Richard to make a call for him.

Testimony of several individuals established Michael was controlling and demeaning toward Linda. Linda's sisters, Wanda Owens, Diana Van Hooser, and Esther Koffin, testified Linda was normally "fun," (*id.* at 1295), "bubbly," (*id.* at 1439), and a "sweetheart." (*Id.* at 1411.) However, around Michael, Linda was "apprehensive, guarded, inconspicuous, careful, [and] quiet." (*Id.* at 1414.) Michael called Linda stupid and fat. He spoke to Linda in "sharp tones," and not in a joking manner. (*Id.* at 1307.) Wanda encouraged Linda to leave Michael and offered to let Linda live with her.

After a family gathering, Van Hooser heard Michael "bawling [Linda] out about why did the gatherings always have to be at their house, why did her cheapskate family have to mooch off of them." (*Id.* at 1416–17.) Linda cried for twenty minutes afterward. On another occasion, Van Hooser went to pick up Linda at Custom Mat, where she worked for Michael. They had plans to help Wanda with some painting. Linda asked Michael for permission to go, and he told her she had to work for half a day. When Linda finally left, she made phone calls to Michael at regular intervals and any time she changed location.

Koffin also testified about a time when she had plans to spend the day with Linda, but Michael told Linda she had too much work to do and he might let her off at noon. Michael eventually let Linda go,

and she called Michael every time they changed location. She was expected home at a certain time, and when she called Michael on her way home, he told her she could visit longer.

Wanda knew Michael prohibited Linda from talking while the television was on. When Michael would discuss Linda's drinking problem, his concern was that she would cause an accident and they would be sued. After Michael told Wanda that he thought Linda had drowned, he said, "I'll be happy to get the Spillman [Linda's maiden name] odor out of the house." (*Id.* at 1316.) Wanda asked what he meant, and he said, "[Y]ou know how everybody has their own odor. I started sleeping in a separate bedroom and that room has the Smith odor. And then..[.] the room where Linda slept had a Spillman odor." (*Id.* at 1316–17.) In addition to running Custom Mat, Michael did some work as a slip and fall investigator. He sent Wanda a "slip and fall" report with his theory of how Linda died. (*Id.* at 1321.) Linda had told Wanda, Van Hooser, and Koffin that she did not use the hot tub alone.

Wanda's husband, Victor Owens, confirmed that Linda was normally "very outgoing," but around Michael, she was "much more subdued" and "careful of what she might say." (*Id.* at 1385.) Michael told Victor he thought Linda was fat and he had her on a diet. He also thought Linda was "frivolous" and he had her on a budget or an allowance. (*Id.* at 1386.) Michael was worried about Linda causing an accident and being sued. Michael told Victor he had called the coroner "because he was young and inexperienced," and told him to "mark it down as an accident." (*Id.* at 1392.) Victor knew the Smiths "made it a set rule" that they would not use the hot tub alone. (*Id.* at 1388.)

Linda had a few sessions with Judy Kline, a counselor. Linda told Kline her

husband "gets verbally abusive," and "everything she did would be criticized by her husband." (Id. at 1824–25.) Linda said her husband "was always telling her that she was stupid." (Id. at 1826.) She wanted to leave, but did not think she could make it on her own economically. She had begun to believe she was stupid and inadequate. Michael controlled the finances and had cashed in her pension fund to help the business. She did not feel like she had a say in the matter. She reported "her husband is mean, demeans her, argues about little things, double binds her." (Id. at 1836.) By "double binds," Kline meant that Michael would place Linda in a Catch–22, where she was wrong no matter what she did. (Id.) Linda was afraid of Michael and said he had "shoved her and knocked her down in the past." (Id. at 1837.) Linda did not want to express her feelings to Michael because he would get angry. Linda said Michael "keeps getting worse." (Id.) Kline suggested that Linda be more assertive and bring Michael to their sessions, but Linda was afraid to do so and "didn't think it would do any good." (Id. at 1840.)

Two of Linda's friends from church, Brenda Fisher and Jonetta Creque, also testified she behaved differently around Michael. Linda was "bubbly," (id. at 1506), "and her smile made the whole room take on a . . . total different aura." (Id. at 1497.) When she was around Michael, she was "quiet," (id. at 1506), and "[s]omber." (Id. at 1497.)

Once, Michael came to Hardee's when Fisher was working there. Fisher asked Michael if Linda was working for him, and he said, "[Y]es, if you want to call it that." (Id. at 1498.) Michael had come pick up food for Linda. He said, "I have to get her something to eat, not that she needs it." (Id. at 1498.) He ordered a grilled chicken sandwich because "she doesn't need anything breaded or deep fried." (Id.)

On another occasion, Fisher saw Linda at the Little Nashville Opry. She knew that Linda and Michael had season tickets, and she asked if they sold tickets they did not use. Linda said they did, and Fisher expressed interest in buying them. Linda said Michael did not like it when she received phone calls or gave out their number. Michael was at the ticket window, and Linda asked Fisher to watch him while she wrote down the number. Michael started to approach them, and Linda put the paper back in her purse, but she was still holding a decorated pen. Michael stared at the pen, and Linda said she was showing Fisher her new craft. She gave Fisher the pen and walked away.

Linda visited Creque on Christmas Eve of 2002. She was crying and said Michael hated her. Later that day, Linda was in an accident; she had been drinking.

Peggy Miller, Deborah Fleetwood, Marie Hall, and Kristen Harden were employees of Custom Mat. They described Linda as "a very sweet, kind person," (id. at 1532), who liked to "laugh and joke around," (id. at 1559), and was "easy to talk to," (id. at 1631), and "perky." (Id. at 2652.) When Michael was around, Linda was "very nervous," (id. at 1532), "subdued," (id. at 1559), and "tense." (Id. at 2653.) Miller and Fleetwood heard Michael call Linda fat and stupid. His tone was "very harsh." (Id. at 1532.)

Miller heard Michael tell Linda her relatives were "bums, they're only after something. When you're around them you act up. They're not a good influence on you." (Id. at 1538.) On one occasion when Michael and Linda had been arguing, Linda said, "[P]lease don't talk to me this way." (Id. at 1539.) Michael grabbed her between the legs in a manner that was not playful. Linda had a "shocked[,] strick-

en[,] painful look on her face." (*Id.* at 1540.) When Michael realized Miller was watching, he let go.

Fleetwood testified the Smiths argued at least every other day. Michael would raise his voice, but Linda responded very quietly. Before Fleetwood left Custom Mat, she told Linda "if she ever needed a place to go, a safe place to stay, she was more than welcome to come and live with [me] and nobody would have to know where she was." (*Id.* at 1563.)

Hall testified Michael would berate Linda, often because of the price she had given a customer. He would tell her she was stupid and should have asked him what the price was. After Linda died, Michael asked Hall to type up a slip and fall report with his theory of how she had died. Michael also opined that there may have been a burglary. Hall left Custom Mat in November of 2005 because she was afraid of Michael.

Miller and Fleetwood left Custom Mat because of the tense work environment, which was caused partially by the Smiths' arguing and partially because of Custom Mat's financial struggles. Custom Mat sold custom doormats. Customers would pay a deposit, and then Custom Mat would design the mats and order them from manufacturers. There were times when manufacturers would not produce the mats because Custom Mat owed them money. Sometimes the phone, water, or electricity would be shut off.

Once, Miller was unable to cash her paycheck because there were insufficient funds in the bank account. Michael asked her to hold an order for several weeks because they needed the money. When she received calls from customers who had not received their products on time, Michael told her to tell them the goods had been damaged in production or the supplies were back ordered. Michael complained to her that Linda was "ruining my business, I've got to get her out of here, I've got to ... either fire her or divorce her." (*Id.* at 1541.)

Linda once asked Fleetwood to hold her paycheck for a few days. When suppliers called, Michael would tell Fleetwood to say he was not there.

Hall testified that Custom Mat had trouble completing orders because suppliers were not being paid. Custom Mat changed its name several times to receive new credit. Randy Ralley, a forensic accountant, testified that Michael had three companies: Custom Mat, Inc.; Custom Mats of America, Inc.; and Custom Mat Company, Inc.

The three businesses lost about $93,000 from 2000 to 2003, and the Smiths made large loans to the businesses. The Smiths' personal cash flow was negative in 2001 and 2002, and possibly 2003.[2] Linda's pension from a previous job was also cashed in to help keep Custom Mat afloat. After Linda died, Michael told Amy Huddleson, a Custom Mat employee, that he intended to use the proceeds of Linda's life insurance to help out the business. American Family Insurance sold a $50,000 decreasing term life insurance policy to each of the Smiths in 1997. An additional $50,000 was purchased for Linda in May of 2003; none was purchased for Michael. Linda's policies were worth about $90,000 in November 2003, and Michael was the beneficiary.

Christopher Lewis, a crime scene investigator with the Indiana State Police,

2. Ralley determined the Smiths' cash flow from tax records, and therefore did not have information about their personal expenses.

In 2003, the Smiths had $28,670.62 of income to meet their personal expenses.

served a search warrant on Michael on November 12, 2003. He examined Michael and found several bruises and scratches. He collected the clothing Michael had been wearing the night Linda died and towels from the spa building. When Lewis took a sample of the hot tub water, he spilled some on the carpet, and he noticed that it did not readily soak in; "it bubbled up on top and stayed on top." (*Id.* at 2644.)

Blood was found on a towel and on Michael's sweat pants and t-shirt. DNA on the towel and the t-shirt matched Linda's and Michael's. Two DNA profiles were found on the sweat pants; one matched Michael's, and the other was consistent with Linda's. No DNA from an unknown source was found in the scrapings from Linda's fingernails, or on the towel, clothing, or jewelry Linda had been wearing. Sean Tucker, a forensic DNA analyst for the Indiana State Police Laboratory, testified that a mixture of DNA does not mean that the DNA was contributed at the same time. It would not be unusual for people who lived together to have each other's DNA on their clothing.

Michael told his sister, Barbara Brown, that someone else's DNA was found at the scene. He knew he was a suspect, but he told Brown "they could never pin it on him because they couldn't physically put him out there at the time of [Linda's] death." (*Id.* at 1481–82.) He reached this conclusion by watching the TV show Forensic Files.

Michael gave a variety of accounts of Linda's death to different people. He told Van Hooser that Linda vomited on him when he pulled her out of the hot tub. However, no one reported seeing vomit on him, on Linda, or anywhere else in the spa building. Michael told one of the paramedics he found Linda face down in the hot tub around 3:00 a.m. He claimed he

pulled her out onto the floor and started CPR before calling 911.

After Linda's death, Michael met Rita Richardson through a dating service. When they met in person, Michael appeared very remorseful and upset. Michael said he and Linda had been in the hot tub together, and he went back to the house to watch the late news and fell asleep. When he woke up, he found Linda half in and half out of the hot tub. He claimed he performed CPR for forty-five minutes before calling 911 because "he couldn't believe that she was gone." (*Id.* at 2763.) He said he originally thought there had been intruders, but then he believed she had a heart attack.

Donald Esselborn had done some odd jobs for Michael. Michael told him that when he found Linda and could not revive her, he held her and cried for a while. He claimed he dressed Linda before he called 911 "because he didn't want people to find her like she was." (*Id.* at 2776.) He opined that Linda may have fallen and hit herself or had a seizure.

On the Monday after Linda died, Michael called Huddleson and gave several theories of how Linda might have died. One was that Linda was drinking and had fallen. Another was that someone was trying to rob their house. He also accused Linda's brother. Michael thought Linda might be having an affair, and the man got angry with her when she tried to end it. Michael thought Linda was having an affair because she would spend hours at Wal–Mart, and he thought she was meeting someone there. Michael asked Huddleson to clean out Linda's desk, and she found a note containing the name of a book: "How to deal with being in an abusive relationship." (*Id.* at 1578.)

Michael told his niece, Tara Brown, he had fallen asleep on his bed, but later he said he fell asleep in a chair. Michael

allowed Brown to look through Linda's things to see if she wanted anything. After Brown found notes hidden in unusual places, Michael stayed very close and told her to give him any papers she found.

## DISCUSSION AND DECISION

### 1. 404(b) Evidence

■ Ind. Evidence Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

In assessing the admissibility of 404(b) evidence, we determine whether the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act, and we balance the probative value of the evidence against its prejudicial effect. *Spencer v. State*, 703 N.E.2d 1053, 1055–56 (Ind.1999). We review the admission of evidence for abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1270 (Ind.2002). An abuse of discretion occurs if the ruling is against the logic and effect of the facts and circumstances before the trial court. *Hawkins v. State*, 884 N.E.2d 939, 943 (Ind.Ct.App.2008).

■ Michael argues portions of the testimony of Kline, Laura Berry Berman, Wanda, Victor, Van Hooser, Fisher, Miller, Fleetwood, Hall, Harden, Dr. Hawley, and Detective Brahaum were admitted in violation of Evid. R. 404(b). (*See* Appellant's Br. at 39–41) (listing specific statements). Of this challenged evidence, Michael objected only to Kline's testimony.[3] "The

failure to object at trial results in waiver of the issue on appeal." *Bruno v. State*, 774 N.E.2d 880, 883 (Ind.2002), *reh'g denied.* Therefore, the challenged testimony of the other witnesses will be reviewed for fundamental error. *Id.* Fundamental error is error so prejudicial as to make a fair trial impossible. *Id.*

Part of the State's theory of the case was that Michael had a financial motive to kill Linda. Michael's businesses were failing, and Michael was the beneficiary of Linda's life insurance policy. Some of the evidence Michael challenges under Evid. R. 404(b) relates to the State's financial motive theory. Michael controlled the finances and had used Linda for financial gain by compelling her to cash in her pension fund. Michael berated her over the prices she gave to customers. He called her stupid, blamed her for problems with the business, and told Miller he thought Linda was ruining his business. When Michael discussed Linda's drinking problem with others, his concern was that she would cause an accident and they would be sued. Michael thought Linda was frivolous and put her on an allowance. All this evidence tends to show Michael's primary concern was how Linda would impact his finances.

■ "A defendant's prior bad acts are . . . usually admissible to show the relationship between the defendant and the victim." *Ross v. State*, 676 N.E.2d 339, 346 (Ind.1996). In *Iqbal v. State*, 805 N.E.2d 401, 408 (Ind.Ct.App.2004), we stated:

> Numerous cases have held that where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and con-

3. Michael objected to some of the evidence on other grounds, but he may not assert one ground at trial and a different ground on appeal. *Collins v. State*, 835 N.E.2d 1010, 1016 (Ind.Ct.App.2005), *trans. denied* 855 N.E.2d 995 (Ind.2006).

frontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime.

The challenged evidence established there was some degree of violence or risk of violence in the Smiths' relationship. Linda told Kline that Michael had pushed her and knocked her down, that she was afraid of Michael, and that he kept getting worse. Miller saw Michael grab Linda between the legs, and Linda responded with a look of pain. Fleetwood apparently perceived Linda to be at risk, as she offered Linda a "safe place to stay" where "nobody would have to know where she was." (Tr. at 1563.) Dr. Hawley, who has conducted extensive studies on strangulation, found a link between strangulation and an escalation of risk in domestic violence situations.

Michael compares his case to *Camm v. State,* 812 N.E.2d 1127 (Ind.Ct.App.2004), where we held evidence of Camm's extramarital affairs was not admissible to show he had a motive to kill his wife. For such evidence to be admissible as proof of motive, "the State must do more than argue that the defendant must have been unhappily married or was a poor husband or wife, ergo he or she had a motive to murder his or her spouse." *Id.* at 1133.

Michael argues the evidence painted him as a poor husband and should not have been admitted as proof of motive. His case is readily distinguishable from *Camm.*

Unlike the evidence of philandering in *Camm,* the evidence admitted in Michael's case involved hostility toward Linda.[4] Furthermore, *Camm* noted infidelity was a common failing and therefore had to be tied to violence or threats to be admissible. *Id.* In Michael's case, the evidence demonstrated violence was only one tactic Michael used to control Linda and manipulate her to his advantage. We find no error in the trial court's admission of these other behaviors, which include belittling Linda, isolating her from her family members by limiting her time with them and making derogatory comments about them, isolating her from friends by preventing her from giving out her phone number, and requiring her to check in with him. Moreover, some of this evidence was cumulative.[5] *See Purvis v. State,* 829 N.E.2d 572, 585 (Ind.Ct.App.2005) ("Improper admission of evidence is harmless error when the erroneously admitted evidence is merely cumulative of other evidence before the trier of fact."), *trans. denied* 841 N.E.2d 180 (Ind.2005), *cert. denied* 547 U.S. 1026, 126 S.Ct. 1580, 164 L.Ed.2d 310 (2006).

Berman, who is the executive director of the Indiana Coalition Against Domestic Violence, defined domestic abuse as "a pattern of coercive behavior used to maintain control over a relationship." (Tr. at 3137.) Berman gave several reasons why a victim of abuse might remain in a relationship, including lack of financial resources, physi-

---

4. Michael asserts hostility is "suspect as a motive." (Appellant's Br. at 35.) It is not. Hostility "is a paradigmatic motive for committing a crime." *Hicks v. State,* 690 N.E.2d 215, 222 (Ind.1997) (quoting *United States v. Russell,* 971 F.2d 1098, 1107 (4th Cir.1992)).

5. Michael does not challenge:

- Van Hooser's testimony that Linda's demeanor was different around Michael and that Michael talked to Linda like she was a child.

- Koffin's testimony that when she spent the day with Linda, Linda regularly checked in with Michael.
- Fisher's testimony that Linda's demeanor was different around Michael and that Michael said Linda did not need to eat.
- Creque's testimony that Linda's demeanor was different around Michael and that Linda told her Michael hated her.
- Miller's testimony that Linda's demeanor was different around Michael.
- Harden's testimony that Linda's demeanor was different around Michael.

cal or social isolation, and lack of self-esteem due to belittling statements. Berman did not testify about any of Michael's actions; therefore, it is unclear why Michael challenges her testimony under Evid. R. 404(b). We note her testimony is relevant and helpful to the jury. A juror who is unfamiliar with domestic violence might doubt that Linda would stay with Michael for thirty years if she were being treated as poorly as the State's witnesses claimed.

Finally, we note the trial court conducted a hearing on the State's notice of intent to use 404(b) evidence and issued an extensive order that excluded large portions of the State's proffered evidence and required that the remaining testimony be based on recent observations. The trial court gave limiting instructions at several points in the trial. The trial court heard Berman's testimony outside the presence of the jury and excluded portions of that testimony. The evidence was probative, as it related to the State's theory that Michael killed Linda for her insurance proceeds and demonstrated a hostile relationship. *See Iqbal,* 805 N.E.2d at 407 (prior bad acts admissible evidence of motive and defendant's relationship with the victim). It was not unduly prejudicial, as the trial court carefully limited the testimony to recent observations and gave limiting instructions. *See Ross,* 676 N.E.2d at 346 (probative value of evidence of defendant's

hostile relationship with victim was not outweighed by its prejudicial effect where none of the acts were remote in time). We conclude the trial court did not abuse its discretion. *See id.* (evidence rulings reviewed for abuse of discretion). Nor can Michael establish fundamental error in the admission of the testimony to which he did not object.

### 2. Sufficiency of the Evidence

█ When considering a challenge to the sufficiency of the evidence, we will not reweigh the evidence or judge witness credibility. *Harmon v. State,* 849 N.E.2d 726, 735 (Ind.Ct.App.2006). We consider only the evidence favorable to the verdict and the reasonable inferences therefrom, and we will affirm if there is evidence of probative value from which a reasonable trier of fact could find guilt beyond a reasonable doubt. *Id.*

Michael acknowledges the jury chose to believe Linda was strangled and it was entitled to do so. Moreover, the State provided ample evidence of Michael's motive to kill Linda.[6] Michael was home alone with Linda when she died, and several aspects of the scene were suspicious. Linda was laid out very neatly and was not wet.[7] Michael was not wet, and there was little, if any, water on the floor, although the carpet was not a type that would readily absorb water.[8] Michael hastily attempt-

---

**6.** Michael argues life insurance policies are common for married couples who have a mortgage or operate a family business, and the amount of Linda's policies was "relatively small for people involved in a business relationship." (Appellant's Br. at 46.) However, there was clear evidence that Michael and his businesses were in dire financial straits. An additional policy had been taken out for Linda, but not Michael, earlier in the year she died, and her policies were a type that has a benefit that declines over time.

**7.** Michael argues, "Six, one of whom thought it might have been due to a hair gel, thought

Mrs. Smith's hair looked wet." (Appellant's Br. at 45.) Our review of the record reveals that only Stephens and Piper testified without qualification that Linda's hair looked wet. Arlan, VanDevander, Ainsworth, Pierce, and Carlisle all testified they thought her hair might have had mousse or gel in it, and some of them specifically noticed her hair was spiked. We admonish counsel to refrain from mischaracterizing the evidence in the record.

**8.** Michael argues "six of the first people to respond to the scene reported seeing water on the hot tub, the steps or the floor." (Appel-

ed to perform CPR when he saw First Responder VanDevander.

In arguing there was evidence that someone else committed the crime, Michael emphasizes the testimony of Mario Gonzales, who delivered pizza to the Smiths the night Linda died. Gonzales arrived at the Smiths' home around 6:30. Gonzales claimed that as he turned to leave, there was a truck blocking his path. He described it as a "two tone" truck with a "camper" on it. (Tr. at 1941.) He thought the truck was brown or tan, but might have been burgundy; he was uncertain because it was dark outside.

Detective Brahaum believed Gonzales was mistaken about seeing a truck at the Smiths' house. Michael told Detective Brahaum no one had been there, and the neighbors did not report any suspicious activity.[9] Michael did not report any property missing. There was no sign of forced entry into the spa building, and no DNA from anyone other than Michael and Linda was found.[10]

Michael argues he "consistently maintained he had fallen asleep and found his wife in the hot tub after he awoke." (Appellant's Br. at 45.) However, Michael's story was inconsistent in a number of details—where he fell asleep, Linda's position in the hot tub, whether he pulled her out and started CPR before calling 911, and whether Linda vomited on him.

Finally, Michael notes he called 911 and did not attempt to conceal the body or flee.

However, the record reflects Michael was confident he would not be held responsible for Linda's death. (*See* Tr. at 1481–82) (Michael told his sister "they could never pin it on him because they couldn't physically put him out there at the time of [Linda's] death.") Michael invites us to reweigh the evidence, which we will not do. There was sufficient evidence for a rational jury to find Michael guilty of murder.

Affirmed.

MATHIAS, J., and VAIDIK, J., concur.

---

lant's Br. at 45.) His citations refer only to Arlan, Stephens, Anderson, and Carlisle. Of these, only Carlisle reported seeing any water on the floor, and he also testified he did not get wet while working on the floor. The others reported seeing only a small amount of water on the edge or steps of the hot tub.

9. Michael also notes his dogs were known to bark if anyone approached, but no one heard barking that night until the emergency vehi-

cles arrived. It is not clear how this evidence could be helpful to Michael; it tends to show no one else approached the Smith property at the time Linda was killed.

10. Michael may be correct that the presence of his DNA does little to prove he killed Linda; however, the absence of others' DNA tends to show no one else was present at the scene.