**Broderick BULLOCK, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 32A01–0809–CR–419.

Court of Appeals of Indiana.

March 25, 2009.

Paula M. Sauer, Danville, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ian McLean, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

Broderick Bullock appeals his conviction of three counts of Class D felony theft [1] for stealing televisions from Wal–Mart on three occasions. We conclude the testimony of the Wal–Mart employee was not incredibly dubious and the other alleged

---

1. Ind.Code § 35–43–4–2(a).

errors are harmless. Therefore, we affirm the convictions.

## FACTS AND PROCEDURAL HISTORY

On December 18, 2007, two men arrived at a Wal–Mart store in a white van. When they exited the store, one of them was pushing a cart containing a Sanyo television. A greeter approached them to ask for a receipt, but they kept walking. As the men were driving away, the greeter wrote down the van's license plate number.

Detective Sean Stoops determined the license plate number matched a van registered to Thelma Hornberger. Detective Stoops watched Thelma's residence until he saw a man fitting the description of one of the suspects come out, enter the van, and drive away. Detective Stoops began to follow the van, which was driven by Thomas Hornberger. When Hornberger saw he was being followed by an officer, he pulled over. Hornberger told Detective Stoops he knew the police were going to be looking for him regarding a stolen television, but Hornberger claimed he "didn't have anything to do with it." (Tr. at 346.)

Hornberger gave a recorded statement to the police. He said Bullock had paid him to take him to Wal–Mart. Hornberger said he had an "idea" what Bullock was going to do, but he did not want "to be a part of it." (Id. at 359.) Hornberger said he had given Bullock rides four to ten times.

Hornberger was charged with two counts of theft. He pled guilty to one count of conversion and promised to testify in Bullock's case.

Bullock was charged with three counts of Class D felony theft, alleging he stole televisions from Wal–Mart on December 10, 15, and 18 of 2007. Hornberger testified he drove Bullock to Wal–Mart on De-cember 15 and 18, but was not involved in the December 10 theft. On both occasions, Hornberger entered the store with Bullock, and he did not see Bullock pay for the televisions.

Benito Bravo, an asset protection coordinator manager for Wal–Mart, identified surveillance videos from December 10, 15, and 18. Bravo recognized Bullock in the videos, but initially he could not remember Bullock's name. Bravo testified he had met Bullock before and has "had conversations at length" with Bullock. (Id. at 279.) Bravo testified the television in the December 10 video was a Samsung, the one in the December 15 video was a Vizio, and the one in the December 18 video was a Sanyo. He checked the UPC codes and established that there were no sales of those televisions on the respective dates.

## DISCUSSION AND DECISION

Bullock raises four issues: (1) whether the trial court committed reversible error by not allowing him to ask Hornberger about the potential penalty he faced if he did not plead guilty; (2) whether the trial court committed reversible error by admitting a recording of Hornberger's statement to a police officer; (3) whether the trial court committed reversible error by not allowing Bullock to impeach Bravo with a change he made to his deposition; and (4) whether Bravo's testimony was incredibly dubious.

### 1. Cross-examination of Hornberger

On cross-examination of Hornberger, Bullock established Hornberger had entered a plea agreement with the State. Hornberger testified he had been charged with two counts of Class D felony theft, but he pled guilty to a Class A misdemeanor and received a year on probation; he also agreed to testify in Bullock's case. Bullock attempted to elicit the maximum

penalty Hornberger could have received had he not pled guilty. The State objected, and the trial court sustained the objection.

A trial court has broad discretion to determine the scope of cross-examination, and its decision will be reversed only for an abuse of discretion. *McCorker v. State*, 797 N.E.2d 257, 266 (Ind.2003). An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court misinterpreted the law. *Rogers v. State*, 897 N.E.2d 955, 959 (Ind. Ct.App.2008), *reh'g denied.*

In *Jarrett v. State*, 498 N.E.2d 967, 968 (Ind.1986), our Supreme Court held a defendant must be permitted to cross-examine a co-defendant witness on the possible penalty faced by the witness because such testimony is "highly suspect."

> Because human nature would tend to cause accomplices to "unload" against their partners and desire to clear themselves as much as possible of blame for a crime, such testimony should be highly scrutinized by the jury or fact finder. *Such fact finding body should have before it all the relevant circumstances that caused or induced such witness to testify, including the rewards for such testimony.*

*Id.* (quoting *Newman v. State*, 263 Ind. 569, 334 N.E.2d 684, 687 (1975)) (emphases in *Jarrett* ).

The trial court therefore erred by curtailing Bullock's cross-examination of Hornberger. However, the error was harmless. *See Smith v. State*, 721 N.E.2d 213, 219 (Ind.1999) (violations of right to cross-examine are subject to harmless-error analysis). "To determine whether an error is harmless, courts look to several factors, including the strength of the prosecution's case, the importance of the wit-

ness' testimony, whether the testimony was corroborated, the cross-examination that did occur, and whether the witness' testimony was repetitive." *Id.* An error "will be found harmless if its probable impact on the jury, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." *Fleener v. State*, 656 N.E.2d 1140, 1142 (Ind.1995).

Bullock characterizes Hornberger as the "linchpin" of the State's case. (Appellant's Br. at 12.) It is true that Hornberger was important to the State's investigation because he was the one who gave the police Bullock's name. However, Hornberger's testimony cannot be described as the "linchpin" of the State's case, as it was merely cumulative as to the essential elements of the State's case. While the jury did not hear the potential penalty Hornberger could have received, it was not in the dark about Hornberger's motive to testify. The jury learned that Hornberger, in exchange for his testimony, was convicted of one misdemeanor instead of two felonies and was permitted to serve his sentence on probation. Therefore, we conclude the probable impact on the jury was minor, and the error was harmless.

### 2. *Admission of Recording*

Detective Stoops testified Hornberger made a formal, recorded statement. The prosecutor handed State's Exhibit 15 to Detective Stoops, and he identified it as an audio recording of Hornberger's statement. The prosecutor moved to admit State's Exhibit 15, and defense counsel stated, "No objection, Judge." (Tr. at 348.) While the judge and the prosecutor were discussing the logistics of playing the recording for the jury, defense counsel corrected herself and objected on hearsay grounds. The court overruled the objection and played the recording for the jury.

■ The State argues Bullock did not preserve the hearsay issue for appeal because the recording was admitted without objection. To preserve an issue for appeal, a party must make a contemporaneous objection at trial. *Staley v. State*, 895 N.E.2d 1245, 1248 (Ind.Ct.App.2008), *trans. denied.* Instantaneous reaction is not necessarily required. *Sheridan v. Siuda*, 150 Ind.App. 395, 276 N.E.2d 883, 888 (1971). "Counsel only need be nimble to the extent that his objection be in time to allow the alleged error to be corrected." *Id.* Before the recording was heard by the jury, Bullock's counsel realized she had intended to make a hearsay objection. Therefore, we decline to find waiver, and we will review the trial court's decision for abuse of discretion. *See Turner v. State*, 878 N.E.2d 286, 292 (Ind.Ct.App.2007) (rulings on admissibility of evidence reviewed for abuse of discretion), *trans. denied* 891 N.E.2d 37 (Ind.2008).

The State asserts the recording is admissible as a prior consistent statement. Ind. Evidence Rule 801(d)(1)(B) provides a statement is not hearsay if the "declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement" and the statement is "consistent with the declarant's testimony, offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, and made before the motive to fabricate arose." Bullock argues Hornberger already had a motive to fabricate when he made the statement to Detective Stoops.

Our Indiana Supreme Court has identified two common scenarios when timing is an issue: "(1) where the declarant was the defendant or equally culpable to the defendant in the crime, such as a co-defendant, and (2) where the declarant was involved before and after but not during the crime." *Stephenson v. State*, 742 N.E.2d 463, 474 (Ind.2001), *cert. denied* 534 U.S. 1105, 122 S.Ct. 905, 151 L.Ed.2d 874 (2002). When the declarant falls under the first category, the motive to fabricate "likely arises immediately upon the commission of the crime." *Id.* at 475 (quoting *Sturgeon v. State*, 719 N.E.2d 1173, 1179 (Ind.1999)). However, there is no bright-line rule for determining whether a motive to fabricate has arisen; it is a fact-sensitive inquiry. *Id.*

A case in the first category is *Bouye v. State*, 699 N.E.2d 620 (Ind.1998). Witherspoon was questioned about a murder because his car looked like the car used in the murder. Witherspoon initially denied any knowledge of the murder. Witherspoon later told police he was driving while Bouye shot at the victim. Witherspoon pled guilty and agreed to testify at Bouye's trial. Bouye impeached him with his original denial of knowledge of the murder. To rehabilitate Witherspoon, the State had an officer read Witherspoon's statements that appeared in the probable cause affidavit. Bouye argued the statements from the probable cause affidavit were not admissible as prior consistent statements because Witherspoon had a motive to fabricate from the time of the murder. Our Indiana Supreme Court agreed. *Id.* at 626.

In reaching that holding, they relied in part on a footnote in *Thompson v. State*, 690 N.E.2d 224 (Ind.1997). Percy told police he had information about Thompson's involvement in the killing of two people at a car dealership. A few months earlier, Percy had been charged with altering a vehicle identification number, a felony. That charge was dismissed in exchange for Percy's testimony about the deaths. According to Percy, he and Thompson went to Hillis Auto Sales where, without any forewarning, Thompson shot both victims, and then Thompson and Percy robbed them. Featheringill, Percy's friend, testified about some state-

ments Percy had made. Thompson was granted a new trial because evidence about a previous murder Thompson had committed was erroneously admitted; however, in a footnote, our Indiana Supreme Court expressed its doubt that Featheringill's testimony would be admissible as a prior consistent statement:

> To be admissible under this Rule, Percy's motive to fabricate had to have arisen after the prior statement was made. Arguably this prerequisite is not satisfied here. Percy's motive to implicate Thompson arose instantaneously because Percy essentially admitted to an accomplice role in the murders; Percy had every reason to shift culpability to Thompson while minimizing his own involvement.

*Id.* at 238 n. 8.

By way of contrast, a case in the second category is *Sturgeon*. Anderson had been dealing drugs to Sturgeon and Coffman shortly before Sturgeon killed Coffman. Anderson later helped Sturgeon move Coffman's body. Anderson testified at Sturgeon's trial, and defense counsel elicited from Anderson that he had pled guilty to assisting a criminal and received a reduced sentence in exchange for his agreement to testify. The State attempted to rehabilitate Anderson with statements he made to the police. Our Indiana Supreme Court acknowledged "the possibility of a motive to fabricate on Anderson's part," but concluded the statements were admissible as prior consistent statements because there was "no evidence tending to implicate Anderson in Coffman's murder and therefore no evidence he had a motive to lie about Sturgeon's involvement." *Sturgeon*, 719 N.E.2d at 1180.

Here, Hornberger drove Bullock to Wal–Mart and entered the store with him. He was caught on surveillance videos, and he knew a Wal–Mart employee had followed them out of the store to write down the license plate number. He anticipated the police would be looking for him, he pulled his van over before an officer initiated a stop, and he immediately made incriminating statements. When Detective Stoops interviewed Hornberger, he told Hornberger he was "in just as much trouble" as Bullock and acting as an accomplice carries the same penalty as the criminal act. (Tr. at 371.) Indeed, Hornberger, like Bullock, was charged with a Class D felony for each incident in which he was involved.

This case is unlike *Sturgeon*, because Hornberger was involved throughout the offenses and there was substantial evidence implicating him in the offenses. This case is more like *Bouye* and *Thompson*, where the declarant was as culpable as the defendant and had a motive to shift blame to the defendant at the time the declarant spoke to the police. Therefore, we conclude the trial court abused its discretion in admitting the recording of Hornberger's statement.

However, the error was harmless. *See Bouye*, 699 N.E.2d at 626 (finding statement not admissible as prior consistent statement, but declining to reverse because evidence was cumulative). The recording was largely cumulative of Hornberger's trial testimony, which, as we have already noted, was cumulative of other evidence in the State's case. Bullock argues the admission of the recording is not harmless error, because in the recording, Hornberger states he had driven Bullock on four to ten occasions. Bullock argues this is an impermissible reference to uncharged conduct; however, Bullock made no objection at trial under Evid. R. 404(b), and we decline to entertain one now. *See Smith v. State*, 891 N.E.2d 163, 171 n. 3 (Ind.Ct.App.2008) (defendant may not object to evidence on one ground at trial and

assert a different ground on appeal), *trans. denied.*

### 3. *Change in Deposition*

■ In a deposition, Bravo stated a Polaroid television was stolen on December 10. Pursuant to Trial Rule 30(E), Bravo reviewed his deposition and submitted a correction. He noted that "Polaroid" should be changed to "Samsung," and listed "wrong TV" as the reason for the change. (Appellant's App. at 188.) At trial, Bravo testified a Samsung had been stolen on December 10. Unaware of the change to the deposition, Bullock attempted to impeach Bravo with his statement that a Polaroid had been stolen on that date. The State objected, arguing the deposition had been changed and his original statement could not be used as impeachment. After confirming Bravo had changed his deposition, the trial court sustained the objection.[2]

Bullock contends the issue of whether a change in a deposition may be used to impeach is one of first impression in Indiana. Bullock urges us to follow the approach of other states that permit a change in a deposition to be used for impeachment. *See, e.g., J.H. Harvey Co. v. Reddick,* 240 Ga.App. 466, 522 S.E.2d 749, 754–55 (1999), *reconsideration dismissed, cert. dismissed.* The State agrees it "may, in some situations, be proper for counsel to ask why [the witness] amended his answer." (Appellee's Br. at 18.)

Even assuming Bullock should have been permitted to ask Bravo about the change in his deposition, we agree with the State that any error was harmless. First, we note Bravo's memory was not at issue.

It was undisputed that he did not witness the thefts, but gathered his information from the same security tapes the jury viewed. Further, the brand of television stolen was relevant only to the ancillary issue of whether Bravo checked the correct UPC codes. The State admitted televisions as demonstrative exhibits, and the jury could determine the accuracy of Bravo's testimony by comparing the televisions with the security tapes. Bullock noted other discrepancies in the police report and Bravo's deposition concerning the brand of the stolen televisions; therefore, the possibility that Bravo had checked the wrong UPC codes was raised to the jury. We conclude the change in Bravo's deposition offered little additional value as impeachment evidence, and hearing that evidence would have had only a minor impact, if any, on the jury.

### 4. *Sufficiency of Evidence*

■ Bullock argues there was insufficient evidence to convict him of the December 10 theft. Hornberger was not involved in the December 10 theft; therefore, the only evidence linking Bullock to that offense is the security video and Bravo's testimony that he recognized Bullock in the video. The video from December 10 is a brief clip showing two men exiting the store with a television. Bullock argues the video is "so short and of such poor quality" that Bravo's testimony that he could identify Bullock in the video is "so inherently improbable that no reasonable person could believe it." (Appellant's Br. at 18.)

■ In reviewing sufficiency of evidence, we do not reweigh the evidence or

2. The State asserts Bullock has waived this issue by not raising it below. The issue arose in an awkward manner because Bullock was unaware of the change in the deposition, and the State brought the issue to light. However, Bullock offered Bravo's original statement as impeachment evidence, and on appeal he argues it was admissible for that same purpose. The trial court ruled on that issue, and we decline to find waiver.

assess the credibility of the witnesses. *Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002). We consider the evidence most favorable to the verdict and the reasonable inferences drawn therefrom. *Id.* We will affirm if there is probative evidence from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.* "Within the narrow limits of the 'incredible dubiosity' rule, a court may impinge upon a jury's function to judge the credibility of a witness." *Id.* The incredible dubiosity rule applies when "a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence." *Id.* The rule is rarely applied and is appropriate only when the testimony is so inherently improbable or equivocal that no reasonable person could believe it. *Id.*

We have viewed the video and acknowledge it is brief and not of excellent quality. However, it is not so poor that we can conclude it is incredibly dubious that a person acquainted with Bullock could identify him in the video. Bullock invites us to reweigh the evidence, which we will not do. *See id.*

Although some errors were made in this case, they do not warrant reversal. Therefore, we affirm Bullock's convictions.

Affirmed.

BRADFORD, J., and FRIEDLANDER, J., concur.