Tom ROSS, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 18S00–9508–CR–936.

Supreme Court of Indiana.

Dec. 31, 1996.

Ronald F. McShurley , Muncie, for appellant.

Pamela Carter, Attorney General, James A. Joven, Deputy Attorney General, Indianapolis, for appellee.

SHEPARD, Chief Justice.

A jury found appellant Tom Ross guilty of murder, a felony, Ind.Code Ann. § 35–42–1–1 (West Supp.1996). The trial court sentenced him to sixty years in prison. In this direct appeal, Ross raises the following issues:

1. Whether the trial court denied Ross a fair and full sentencing hearing when it restricted his oral statement to the court;

2. Whether the trial court erred in refusing to allow defense witness Sherry Williams to testify about a telephone conversation she had with the victim, Paula Ross;

3. Whether the trial court erred in allowing evidence of prior acts of uncharged misconduct by Ross which were directed towards the victim;

4. Whether there was sufficient evidence to support Ross' conviction for murder; and

5. Whether the sentence imposed by the trial court was reasonable.

We conclude that the trial court did not err and that the conviction and sentence should be affirmed.

## I. Facts

Tom Ross ("Ross") and Paula Ross ("Paula") were married, and had two children. They lived in the town of Gaston, Indiana. About a year before marrying Paula, Ross was involved in an automobile-bicycle accident in which he received a head injury and suffered brain damage. As a result, Ross was unable to work and received Social Security Disability payments. On June 28, 1994, Ross and Paula both filed dissolution of marriage actions. Paula's action was subsequently dismissed when her attorney learned Ross had filed his petition. Ultimately, Ross moved from the marital residence. During the months from June through October, Ross periodically stayed overnight with his cousins, Shirley Helton and Helen Pearson. The divorce was final on October 3, 1994. Paula received custody of their two children, pos-session of their house, and child support payments from Ross.

On the morning of October 5, 1994, Ross was sitting on Jim and Pam Wright's back porch. Ross' truck was parked in front of the Wright's home. The Ross residence is in full view from the Wright's back porch. Paula came out of her house with her daughter Cassandra and drove her to Gaston Elementary School. At that same time, Ross arose from the Wright's back porch, ran to the front of the house, entered his truck and drove, towards Gaston, in reverse, at high speed.

Having arrived at school, Paula primped Cassandra in preparation for having her school pictures taken. After readying Cassandra, Paula began to drive away. Kimberly Long, who had also taken her daughter to school that day, was also driving down the lane that exits the school grounds. Long encountered Paula's car, which was stopped behind Ross' truck. As she drove by the two vehicles, Long saw Ross standing at Paula's car window with his right hand resting on the door jam. Continuing to watch the scene through her rear-view window, Long saw Ross reach into the car with his right arm, moving it back and forth. Ross then pulled his arm out of the car and ran to his truck. Long did not hear a gun shot, nor did she see a gun.

Vicky Ailes left the school about thirty seconds after Paula, and she also came upon Paula's stopped car. She saw that Paula was slumped toward the passenger side of the car. The driver-side door of Paula's car was open, and Ross was squatting in the doorway. Ailes stopped, exited her car, and ran toward Paula's car. Ross asked Ailes to call the police. Ailes returned to the school to seek help.

Susan Tuttle, after dropping off her son for school that day, drove up behind Paula's car and heard Ross yelling that "she had shot herself, his wife had shot herself, and for someone to get help." (R. at 795.) Tuttle got out of her car to help. She also observed a woman in the driver's seat, slumped toward the passenger's seat. The victim's eyes were open and there was a bullet wound on her left temple. Tuttle

checked to see if she was breathing or had a pulse and had to pull Ross away from her because he kept shaking her. Tuttle and Ross moved toward the grass nearby, where Tuttle restrained Ross until the ambulance arrived. Ross eventually returned to Paula's car, pulled a gun out of a pocket in the door and pushed it toward Tuttle saying, "Get this out of here." (R. at 800.) Tuttle took the gun and locked it in her car trunk.

An ambulance took Paula to Ball Memorial Hospital. While Ross was being treated at Ball's intensive care unit, Officer Bob Crabbs gathered Ross' clothing and bagged his hands. The results of a trace metal test of Ross' right index finger were consistent with someone who had held a revolver and pulled the trigger. A gunpowder test on Ross' hands had a negative result. Ross' coat was sent to the lab and it tested negative for gunpowder residue. Trace-metal and gunpowder tests conducted on the victim's hands were negative.

## II. Right of Allocution

Ross claims the trial court erred in restricting his opportunity to make a statement at sentencing.

When Ross and his lawyer appeared for the sentencing hearing, the court noted the jury's verdict, acknowledged receipt of the defendant's pre-sentencing memorandum, and inquired if the State had any additional written statements or memoranda. It did not. The court then inquired into Ross's appraisal of his attorney's representation. Ross said he was satisfied and did not believe there was anything his attorney failed to do. The court asked both sides if they wished to present evidence. Each responded in the negative.

The court then informed Ross that he would be afforded an opportunity to make a statement before the court imposed sentence. Ross began reading his statement. Ross proceeded to inform the court of his family

and personal history. Several minutes into his soliloquy, the court stopped him and instructed him that "the purpose of the statement at this time is for Mr. Ross to tell me anything that he would like to tell me in his own behalf. The purpose is not to go through the whole family history at this point." (R. at 1639.) The court ordered a short break, asking defense counsel to speak with his client about the purpose of his statement.

When the court reconvened, counsel was asked if his client was prepared to continue with his statement. Counsel objected to the limiting of the defendant's statement and entered the remainder of his prepared statement into the record.[1] At this point, the court quoted Ind.Code § 35–38–1–5 to counsel and reminded him that "the statement was to be a statement in his behalf, not a narrative of the whole history of this family." (R. at 1642.) Ross then continued his statement in his behalf. The remainder of his statement to the court consumed approximately five additional pages in the record. He spoke of his "clean" criminal record, his children, his pain, his character (non-violent nature), how he will miss Paula, how he will miss his children if he is sent to prison, how he was sorry that he violated the restraining order, why he thought his life history was important, how he helped his mother, his remorse about the pain Paula's parents and his children were going through, and how important it was for the judge to take a look at his life before the 1994 "incident."

The court listened to Ross' statement, "reviewed the balance or most of the balance of the [written] statement" (R. at 1666.) inserted in the record and stated that it would review the written statement in its entirety. The court then asked Ross' counsel if there was any reason why sentence should not be imposed, to which he responded, "No, Your Honor." (R. at 1698.) Noting that "it takes

---

1. Ross' statement was approximately twelve and one-half single spaced typed written pages. Ross had read approximately two and one-half pages of it. The remainder of his statement discussed the loss of his boy two days after his birth, his and Paula's financial problems, the death of his brother, this incident, his and Paula's dissolution, Paula's lying on the stand during the disso-

lution proceedings, how he did not want anyone to know some things about Paula (mainly to protect her parents) and statements/questions which he wanted to make to/ask of Mr. Cummins (the prosecutor), Judge Barnet, and several witnesses. He also wanted to comment on the evidence at trial in general.

a special kind of person to knowingly kill the mother of his own children," the judge committed Ross for the maximum period of sixty years. (R. at 1710.)

The right of allocution, "sometimes called the allocutus, was recognized by the common law as early as 1682."[2] In general, the right of allocution presents itself as follows:

The trial is over, the jury has reached a verdict and the accused is guilty of the crime with which he was charged. Now he stands at the bar of justice, a prisoner, and the judgment of the law is to be pronounced. But, before the court decrees the inexorable legal consequences which necessarily follow the finding of guilt, the court formally addresses the prisoner, informs him of the jury's verdict and directly puts the interrogatory, "Do you know of any reason why judgment should not be pronounced upon you?"[3]

Legal scholars have defined allocution as:

The formal name of the pre-sentencing procedure dear to movie and television scriptwriters, at which the judge asks the convicted criminal if he has anything to say why sentencing should not be pronounced against him. It has the practical advantage of preserving in the record, by the defendant's reply, evidence of his presence and freedom to speak.[4]

■ Indiana's right of allocution is codified at Ind.Code Ann. § 35–38–1–5 (Burns 1994):

When the defendant appears for sentencing, the court shall inform him of the ver-dict of the jury or the finding of the court. The court shall afford counsel for the defendant an opportunity to speak on behalf of the defendant. The defendant may also make a statement personally in his own behalf and, before pronouncing sentence, the court shall ask him whether he wishes to make such a statement. Sentence shall then be pronounced, unless a sufficient cause is alleged or appears to the court for delay in sentencing.

In Indiana, the purpose of the right of allocution is to give the trial court the opportunity to consider the facts and circumstances relevant to the sentencing of the defendant in the case before it. *Dillon v. State*, 492 N.E.2d 661 (Ind.1986); *Page v. State*, 424 N.E.2d 1021 (Ind.1981); *Shanholt v. State*, 448 N.E.2d 308, 320 (Ind.Ct.App.1983). "This goal [is] accomplished [where the defendant is] given the opportunity to explain [his] view of the facts and circumstances. . . ." *Id.* As at common law, "the purpose of the judge's question, or allocution, was not to seek mitigating evidence or a plea for leniency, but rather to give the defendant a formal opportunity to show one of the strictly defined legal grounds for avoidance or delay of the sentence." *Minton v. State*, 400 N.E.2d 1177, 1180 (Ind.Ct.App.1980).[5]

■ Affording a defendant the right of allocution requires a modest degree of formality. The statute requires the trial court judge to inquire directly of the defendant whether he wishes to make a statement on his own behalf.[6] "The most persuasive coun-

**2.** Jonathan Scofield Marshall, Comment, *Lights, Camera, Allocution: Contemporary Relevance or Director's Dream?*, 62 Tul.L.Rev. 207, 209 (1987).

**3.** Paul W. Barrett, *Allocution*, 9 Mo.L.Rev. 115 (1944).

**4.** Marshall, *supra* note 2, at 208 (quoting Arthur Allen Leff, *The Leff Dictionary of Law: A Fragment*, 94 Yale L.J. 1855, 1999 (1985)).

**5.** At common law, the purpose of the defendant's allocution right was to give him "an opportunity to move in arrest of judgment pleading specific legal defenses available to him." Marshall, *supra* note 6, at 210. These defenses were:

First, even though guilty, one could be exempt from punishment if certain judicial requirements were met.[ ] Second, a number of peo-ple were exempted from punishment by pleading the benefit of clergy as a defense.[ ] Still others could claim the benefit of a pardon, which was often granted as a matter of grace or alternatively might be purchased.[ ] Third, if a woman was pregnant the death sentence would be postponed until after the birth of the child.[ ] Fourth, the defense of insanity of the prisoner after conviction was also grounds for a reprieve.[ ] And, last, if the person sentenced was not the one tried he could plea mistake, warranting relief from sentence.[ ]
*Id.* (footnotes omitted).

**6.** In *Shanholt*, the defendant argued she was not afforded her allocution right. The Court of Appeals found that, although the trial court did not explicitly ask the defendant if she wished to make a personal statement, she made one nonetheless and that the goal of the statute was thus accom-

sel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961). The trial court judge should unambiguously address the defendant and leave no question that the defendant was given an opportunity to speak on his own behalf. *Id.* at 305, 81 S.Ct. at 655–56.

■ Nevertheless, there are boundaries to a defendant's statement:

Allocution does not grant a defendant the right to enter into a diatribe of the sentencing Judge, or of the Court, or the judicial system of which he is apart. It is not a time for platform speeches on either philosophical, religious or political issues. All are provided by our laws with opportunity for full public discussion to an extent which has never been equaled by any organized society or government. The time of imposition of sentence is not a public forum to be used by either a defendant or his attorney for that purpose.

*United States v. Mitchell,* 392 F.2d 214, 216 (2d Cir.1968). The defendant only has a right to express his views of the facts and circumstances surrounding his case and to articulate reasons as to why judgment should not be imposed at that time.

■ It is clear the trial court asked Ross if he desired to make a statement. It is also apparent that the court limited the breadth of the defendant's oral statement (although it did allow his entire pre-drafted statement to be entered into the record). The court listened to Ross describe his relationship with the victim, his employment history, his care for his children, his accident, and other topics. Not once did Ross state why the court should withhold imposition of sentence.

■ The court was acting within its discretion when it stopped Ross and told him to direct his statement toward the proper purpose. While a trial judge should be cautious

about restricting the statement of a defendant, the court may act to curtail abuse of the right. Generally, a court would be well advised to allow a defendant to say his or her piece. In the case at bar, however, there is nothing in the record that indicates that the defendant was not afforded an opportunity to make a personal statement about the facts and circumstances in this case or that the trial court did not reach its final sentencing decision until after it heard (and read) all of the evidence. Accordingly, there was no error.

### III.  Decedent's Statement as Hearsay

■ At trial, Ross called Sherry Williams to testify on his behalf. Ross' attorney asked the witness whether she had a telephone conversation with Paula during August or September of 1994 in which she threatened to kill her husband. The State objected on grounds that the statements were hearsay and irrelevant. The court sustained the objection. Defense counsel claimed the testimony was admissible under Indiana Rule of Evidence 803(3), saying "it would be describing or could describe the decedent's intent, plan, motive[,] ... design, or mental feeling at that time...." (R. at 1472–73.) Counsel also claimed the evidence was relevant because it could show possession of a weapon by the decedent. Counsel then made an offer of proof to the effect that Williams would have testified that during August or September 1994, she had a telephone conversation with Paula in which Paula stated she had filed a citation against the defendant, they were going to court that coming Friday, and if Ross did not go to jail, she would shoot him at the courthouse.

Ross argues that Williams' testimony was admissible for two reasons: first, that this testimony was relevant to help establish that Paula had a gun or access to a gun with

---

plished. *Shanholt,* 448 N.E.2d at 319. The Court of Appeals held that the goal was accomplished when "she was given the opportunity to explain her view of the facts and circumstances throughout the hearing." *Id.* at 320. During the sentencing hearing, the defendant answered questions, her counsel answered questions, and

her counsel presented arguments on her behalf. It was error not to ask the defendant if she wished to make a statement, but this error was harmless because the defendant "failed to demonstrate what more she wished to add or how she was harmed by the way in which her sentencing hearing was conducted." *Id.*

which she could have shot herself,[7] and, second, the evidence was not offered for the truth of the matter asserted but to show the decedent's then existing state of mind. Ind. R. Evid. 803(3).

■ Generally, an out-of-court statement is not admissible to prove the truth of the matter asserted. Rule 803(3) allows statements of the declarant's then-existing state of mind, such as intent, plan, motive, and design, to be entered into evidence. In *Taylor v. State*, 659 N.E.2d 535 (Ind.1995), we noted some instances in which testimony about a victim's state of mind is admissible: (1) to show the intent of the victim to act in a particular way, (2) when the defendant puts the victim's state of mind in issue, and (3) sometimes to explain physical injuries suffered by the victim. We will only reverse a trial court's hearsay ruling if the court has abused its discretion. *Light v. State*, 547 N.E.2d 1073, 1081 (Ind.1989). We affirm the trial court's ruling if it can be done on "any legal grounds apparent in the record." *Id.*

Ross argues that "had Paula's statement been entered into evidence, [he] could have argued that due to her state of mind, she could have been suicidal, and that she did possess a weapon that could have been used to take her life." (Brief of Appellant at 11.)

Ross wanted the statement admitted to prove the truth of the matter asserted in the statement, that Paula intended to shoot Ross, which thereby implied that Paula possessed or had access to a gun. Consequently, it is inadmissible. In addition, Paula's state of mind was not a material issue in the case.[8] Certainly, deciding whether Paula's state of mind was in issue in this case was within the trial court's discretion. The trial court properly excluded Williams' testimony.

## IV. Prior Bad Acts

■ At trial, over Ross' objection, the State was allowed to present evidence of other wrongs or acts Ross committed before Paula's death.[9] These prior bad acts include, but were not limited to, statements that Paula "would pay;" that Ross had previously forced Paula's car off the road; that Ross threatened to kill Paula; that Ross had secretly entered Paula's bedroom at night and held a gun to her head while she was asleep; and that Ross dressed in Paula's clothes and waited for her in her basement during the evening hours.[10] Ross claims that the primary purpose in presenting this evidence was to show that he was a person of bad character and that he acted in conformity

---

7. Ross argues that the statement shows Paula's intent to shoot Ross, thereby establishing her possession of a gun.

8. Whether Paula's state of mind was at issue or not, the statement did not tend to show that her state of mind at the time of the statement was suicidal. Paula's then-existing state of mind was that of rage and anger towards the defendant. The statement refers to threats towards the defendant, not of any suicidal tendencies. If Ross had claimed self-defense, and he had knowledge of the statement, this statement would have gone to his then existing state of mind and claim of self-defense and would have been admissible hearsay. *Kelley v.* State, 541 N.E.2d 309 (Ind.Ct. App.1989); *Shepard v. State*, 451 N.E.2d 1118 (Ind.Ct.App.1983).

9. Ross does not claim that the prosecution did not provide reasonable notice in advance of the trial of the evidence which it intended to introduce with respect to other crimes, wrongs, or acts. Prior to trial, the defendant filed a Motion to Compel Disclosure of Evidence pursuant to Ind. Evidence Rule 404(b). The State filed certain pre-trial responses to the defendant's mo-

tion. During the fourth day of the jury trial, the State filed an additional response to the defendant's 404(b) request. Arguments were heard with respect to all of the State's responses and the trial court entered preliminary rulings and orders allowing and disallowing certain of the State's proposed evidence.

10. Wilbur Collins testified that one night, approximately two or three weeks after the Gaston Lion's Club Fair, which was held in August 1994, he had a conversation with Ross. Collins testified that Ross told him he had gone to the fair one night "to get her," (referring to Paula) but that he was stopped and questioned by a police officer. (R. at 680.) Ross told him he had a gun with him when he went "to get her." The police officer did not see the gun. Teresa Detharge, who worked with Paula at Pro Care Development, testified that near the end of August, 1994, while she and Paula were working outside at Pro Care, Ross stopped by to talk to Paula. Ross threatened to kill Paula before he would allow her to take his children from him in the divorce. Ross stated, "[Y]ou cannot take my kids away, I won't let you take my kids away from me, I will kill you before I allow you to take my kids away from me." (R. at 657).

therewith on the morning of October 5, 1994. *See* Ind. Evidence Rule 404(a).

"Whenever the State attempts to introduce evidence of an instance of the defendant's prior uncharged misconduct, the trial court must look to see whether that evidence is offered to prove something other than the defendant's bad character or propensity to commit the charged crime and whether its probative value outweighs its prejudicial effect." *Johnson v. State,* 645 N.E.2d 643, 648 (Ind.Ct.App.1994); Ind. Evidence Rule 404(b) & 403. Evidence of other crimes, wrongs, or acts "may ... be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, ... ." Ind. Evidence Rule 404(b). Evidence of motive is always relevant in the proof of a crime, *Taylor v. State,* 587 N.E.2d 1293 (Ind.1992), *reh'g denied; Chanley v. State,* 583 N.E.2d 126 (Ind.1991). A defendant's prior bad acts are also usually admissible to show the relationship between the defendant and the victim. *Thompson v. State,* 625 N.E.2d 1322 (Ind.Ct.App.1993). We review trial court rulings for abuse of discretion. *Minnick v. State,* 544 N.E.2d 471 (Ind.1989).

In the present case, the trial court did not abuse its discretion. The evidence in question is admissible because it demonstrated the defendant's motive and intent to commit the murder, illuminated the relationship between the defendant and victim. Its probative value was not substantially outweighed by the possible prejudicial effect. None of the threats or acts in question were remote in time. At most, the testimony that Ross had threatened to harm and kill Paula occurred two months before the murder. The dissolution of marriage was then pending and Ross was facing the possibility of losing the marital residence and custody of his children. Ross wanted to "get even" with Paula for the divorce, to "make her pay." While the dissolution proceedings were pending, Ross acted

upon his feelings, running Paula off the road, going to the Gaston Lion's Club Fair to "get her," and sneaking into Paula's home to do harm. The trial court clearly acted within the bounds of its discretion in admitting this evidence.

### V. Sufficiency of the Evidence

In reviewing sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses because those matters are exclusively within the province of the trier-of-fact. *Tillman v. State,* 642 N.E.2d 221, 223 (Ind.1994). We only consider the evidence supporting the verdict and all the reasonable inferences to be drawn therefrom. *Tillman,* 642 N.E.2d at 223. If each element of the crime is supported by substantial evidence, we will affirm the trial court. *Tillman,* 642 N.E.2d at 223.

The State concedes its case against Ross was "a classic case involving circumstantial evidence." (R. at 1485) As the appellant recognizes, however, circumstantial evidence may be sufficient to support a conviction. Looking at the testimony and physical evidence, along with all the reasonable inferences drawn therefrom, it is clear that a reasonable jury could infer guilt beyond a reasonable doubt.[11] We decline to disturb this result.

### VI. Enhanced Sentence

Appellant contends that his sixty-year sentence is manifestly unreasonable in light of the nature of the offense and his character. He claims that the trial court abused its discretion when it failed to give the proper weight to "Ross' abused character and his extremely diminished capabilities." (Appellant's Brief at 15.)

Ross filed a pre-sentencing memorandum which contained numerous "character letters." These letters spoke very highly of Ross' character, his work ethic, and his devo-

---

11. Appellant urges that the sufficiency of the evidence should be questioned due to the fact that Paula's jacket and white blouse were never sent to the Indiana State Police Lab for gunpowder testing. Officer Jerry Golden testified that any testing of those items to find gunpowder

residue would prove fruitless, as those items were soaked with blood. (R. at 1033–35, 1053.) The reasonable inference from the aforementioned facts is that sending the jacket and blouse would "prove fruitless."

tion to his children. The trial court acknowledged these letters and their reference to Ross' "fine" character. Ross' memorandum contained a report of physical status which also addressed Ross' character and the head injury he received in an automobile-bicycle accident. The trial court heard additional evidence regarding Ross' head injury and mental condition. With regard to Ross' mental condition, the trial court stated in its sentencing order that "there was a reduction in the defendant's mental capability," but that the "defendant's mental condition did not impair his ability to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirement of the law." (R. at 275.) [12]

The trial court considered the hardship Ross' imprisonment would cause his children as well as the reduction in his mental capacity. The court also found several aggravating circumstances, including Ross' prior criminal history, which indicated his disdain for the law and authority; Ross' need for correctional treatment, where prior attempts to rehabilitate him were unsuccessful; that the imposition of less than an enhanced sentence would depreciate the seriousness of the crime, due to the heinous nature of the crime; the fact that the murder was premeditated, as evidenced by Ross' prior threats and stalking of Paula before the murder; and the conclusion that Ross would commit other crimes.

 The scope of our review is defined by Ind. Appellate Rule 17(B):

(1) The reviewing court will not revise a sentence authorized by statute except where such sentence is manifestly unreasonable in light of the nature of the offense and the character of the offender.

(2) A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and offender for which such sentence was imposed.

We review the trial court's imposition of the sixty-year sentence only for abuse of discretion. *Smith v. State,* 580 N.E.2d 298, 303 (Ind.Ct.App.1991), *trans. denied.* It is primarily the trial court's responsibility "to determine the weight to be given the aggravating or mitigating circumstances, . . . ." *Id.* The "proper" weight to be afforded by the trial court to the mitigating factors may be to give no weight to them at all. *Matheney v. State,* 583 N.E.2d 1202, 1209 (Ind.1992), *cert denied,* 504 U.S. 962, 112 S.Ct. 2320, 119 L.Ed.2d 238.

We decline the invitation to second-guess the trial court's balancing of the circumstances affecting sentencing. Although Ross raises a plausible scenario under which the mitigators could be afforded greater weight, he must first recognize that the trial court is not obligated to accept a defendant's version of what constitutes mitigating circumstances. *Magers v. State,* 621 N.E.2d 323 (Ind.1993). A man's premeditated murder of his children's mother shows deliberate disregard of his children's needs and presents little cause for leniency. The trial court did not err in rendering sentence.

The trial court is affirmed.

DICKSON, SULLIVAN, SELBY and BOEHM, JJ., concur.

---

**12.** "Low mental capacity is not a defense to a criminal charge." *Magers v. State,* 621 N.E.2d 323, 324 (Ind.1993). The trial court did find Ross' diminished mental capability to be a mitigating factor.