Steven Craig **ALLEN**, Appellant–
Defendant,

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 45A03–0907–CR–356.

Court of Appeals of Indiana.

April 16, 2010.

Transfer Denied June 17, 2010.

Marce Gonzalez, Jr., Dyer, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Jodi Kathryn Stein, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Steven Craig Allen appeals his convictions and sentences for three counts of

murder and arson as a Class A felony. We affirm.

### Issues

Allen raises five issues, which we restate as:

I.  whether the trial court abused its discretion by admitting certain photographs with captions;

II.  whether the trial court abused its discretion by admitting evidence of Allen's extramarital affair;

III.  whether fundamental error occurred because of the lack of a limiting instruction regarding the evidence of Allen's extramarital affair;

IV.  whether the evidence is sufficient to sustain his convictions; and

V.  whether the 220–year sentence is inappropriate in light of the nature of the offense and the character of the offender.

### Facts[1]

Allen and Christy Gipson met in 1988 and got married in July 2000. Allen told Christy's family that they were not going to have children, and Allen often referred to Christy as "a monster." Tr. p. 1334.

Raymond Okwei, Norma Rivera, and Allen worked together in 2004. During that time, Allen started a sexual relationship with Rivera. After their job ended in mid–2004, Okwei and Allen lost touch with each other, but Allen and Rivera continued their affair.

In October 2004, Allen and Christy moved into apartment 1–C at 6620 Tangle-

---

1.  Indiana Appellate Rule 46(A)(6) requires that the appellant's brief contain a statement of the facts relevant to the issues on appeal. Although the jury trial in this matter lasted three weeks and the transcript of the trial is more than 4000 pages long plus five volumes of exhibits, Allen's entire statement of the facts is half of a page long. Allen's statement of the facts is clearly inadequate.

wood Drive. The apartment consisted of one bedroom with a window and a walk-in closet, a living room, a bathroom, a kitchen, and a dining room area. 6620 Tanglewood Drive contained twelve apartments, four apartments on each of three levels. The first floor of 6620 Tanglewood Drive consisted of apartments 1–A and 1–D on the building's front entrance on the east side and apartments 1–B and 1–C on the building's back entrance on the west side. A hallway and stairwell led from the front entrance on to the back entrance where a pond was located. The apartments on the second and third floors corresponded with the apartments on the first floor. For example, apartments 2–C and 3–C were directly above apartment 1–C. Each of the first floor apartments had a sliding glass door leading to a patio, and each of the second and third floor apartments had a sliding glass door leading to a balcony.

Christy became pregnant, and their baby, Javonae, was born on April 6, 2005. At a family barbeque on Memorial Day weekend in 2005, Allen described Javonae as a "hollering, greedy mother f* * *er." *Id.* at 1328. He also thought that Christy was "over excited" about Javonae. State's Exhibit 387A at 22. When Christy went back to work after her maternity leave, Allen was unemployed. Christy told her mother that Allen wanted her to get a babysitter but that she refused because he was not working and could watch the baby.

In May or early June 2005, Okwei got Allen's phone number from a mutual friend, and they renewed their friendship. One evening, Okwei went to Allen's apartment, and they talked. Allen complained about their bills, the baby keeping him awake at night, and taking care of Christy's dog. On about June 13, 2005, Okwei visited with Allen again. Okwei rode with Allen to Rivera's house, but she was not at home. On the drive, Allen told

Okwei that Rivera wanted him to go to Florida with her on July 2, 2005, and that Rivera wanted him to leave Christy. Allen again complained about his bills, the baby keeping him awake at night, and Christy's dog. Allen told Okwei that he was "going to kill somebody close to [him]." Tr. p. 704. Allen also told Okwei that "he wanted to be a paid assassin." *Id.* at 705. Okwei offered to put Allen in touch with a friend at African Creations about a job. At the end of June, Allen started working the day shift at African Creations.

On the evening of July 1, 2005, Christy got home in the evening after shopping for baby clothes. Allen was upset because he believed Christy had spent too much money. Allen thought that they were "spoiling" the baby and told Christy to "slow it down." *Id.* at 3378. Christy tried to show Allen the clothes, but he "didn't want to see it." State's Exhibit 387A p. 23. That evening, Allen and Christy drank vodka. At approximately 10:00 p.m., Allen put Javonae in a car seat and put her on the bed in the bedroom with Christy. Allen then made a bed on the floor in the living room and started watching a movie.

That night, a fire started sometime after 4:00 a.m. in the apartment building. Cynthia Kiepura lived in apartment 2–D. Kiepura woke up at 4:35 a.m., and smelled smoke in her apartment. Kiepura sustained second and third degree burns on her hand when she grabbed the doorknob on her front door, and the hallway was hot and full of smoke. She went into the smoky hallway and made her way down the stairs to the front door. When she got outside, she was covered with black soot, and she was filthy.

Nick Capolillo lived in apartment 3–B with his girlfriend, Taisha Johnson. At approximately 4:40 a.m., Johnson woke Capolillo because the building was on fire. They tried to leave through the front door

into the stairway, but the smoke was "overwhelming." Tr. p. 471. They went onto the balcony where they saw flames coming toward them. They climbed down onto the balcony below them, and Capolillo jumped to the ground. Johnson fell and hurt her ankles, a knee, and her face. Capolillo saw Allen standing in front of the sliding glass door to apartment 1–C. Allen said that he "couldn't believe they wouldn't let him in there to get his family." *Id.* at 483. Capolillo saw no one near Allen, and no one was stopping Allen from going in the building.

Oya Carter lived in apartment 1–B with his girlfriend, Samantha Smith, and her daughter. Carter was sleeping in his living room when strange noises woke him up, and he saw flames outside coming from the right of his apartment. They tried to leave the apartment through the front door, but the door handle was too hot. They left the apartment through the sliding glass door, which opened onto a patio. Carter saw Allen standing near the patio door to apartment 1–C. Allen said that his wife and baby were still in the apartment, and Carter asked if he was going in to get them. Allen did not respond and did not try to enter the apartment.

Venus Miller lived in apartment 2–C with her husband, Daniel Miller, her daughter, Henrietta Miller, and her two grandchildren. Apartment 2–C was directly above apartment 1–C. Daniel woke Venus after smelling smoke. Venus looked out of her bedroom window and saw Allen wearing a white shirt and standing below her apartment. Venus then saw that her balcony was on fire, and she asked Allen, "why didn't you tell me my balcony was on fire." *Id.* at 517. Venus, Daniel, Henrietta, and the children attempted to leave the apartment through the front door, but the hallway was full of black smoke. The family's only exit was

through the bedroom window. They dropped the children from the second floor window to Carter, who caught them. Venus, Daniel, and Henrietta also jumped from the second floor window. Carter was standing near the bedroom window for apartment 1–C when he assisted the Millers. Allen "was just standing there" and did not assist the Millers or attempt to open the bedroom window of apartment 1–C to save Christy and Javonae. *Id.* at 555. A short time later, Henrietta saw Allen again and noticed that his clothing was clean.

Marge Neely lived in apartment 3–A. The smoke alarm in the hallway woke Neely, who was sleeping on the couch. The front door to her apartment was hot, and the hallway was full of black smoke. Neely took her two-year-old daughter onto the balcony and called 911. Neely did not see any flames on the east side of the building. Neely and her daughter were rescued by firemen with a ladder.

Mohammad Jaber Mattour lived with his brother in apartment 3–D. The fire alarms woke Mattour's brother, but they could not enter the hallway because of the black smoke. They went to the balcony where they climbed down onto apartment 2–D's balcony and jumped to the ground. Mattour did not see flames on the east side of the building, but he saw flames coming out of the first floor on the west side. According to Mattour, the flames were coming from apartment 1–C.

Manoj Rana and Prabhat Singhal, engineering students from India, lived in apartment 3–C, two floors directly above Allen's apartment. Singhal woke Rana and told him that the apartment building was on fire. Rana saw that their balcony was on fire. Singhal made two calls to 911, reporting that the apartment building was on fire and that they were trapped in their apartment. Singhal also called their

friend, Pranav Pranav, at approximately 4:45 a.m. and told Pranav that their apartment building was on fire and that they were trapped. Rana opened the front door of the apartment and tried to run down the stairs, but encountered "pitch black smoke." *Id.* at 197. Rana felt the heat on his bare feet and lost consciousness.

Officer Paul Maldonado of the Hammond Police Department received a dispatch regarding a fire at 6620 Tanglewood Drive at 4:41 a.m. and arrived on the scene at 4:43 a.m. Officer Adam Clark was following Officer Maldonado into the apartment complex. Officer Maldonado went to the front of the building, and Officer Clark went to the back of the building. Officer Maldonado saw people on their balconies on the front side of the building and saw smoke but did not see fire. At the back of the building, Officer Clark saw flames shooting out of the sliding glass door to apartment 1–C. When Officer Clark radioed for assistance, Officer Maldonado went to the back side of the building and assisted tenants.

After the officers had been helping tenants for several minutes, Allen approached the two officers and said that his wife and child were still in an apartment. Allen was "very mellow . . . very calm." Tr. p. 841. Allen initially pointed at apartment 1–B, but then informed the officers that they were in apartment 1–C. By that point, apartment 1–C was engulfed in intense flames, and the officers were unable to get into the apartment. Officer Maldonado and Officer Clark noticed the smell of alcohol on Allen's breath. Allen told Officer Maldonado that he was sleeping on the couch when his wife woke him up, told him that the building was on fire, took him outside, and went back inside to get the baby.

When the Hammond Fire Department arrived at the apartments, flames were coming from the ground level up to the roof of the back side of the building. The firefighters learned that tenants were still trapped in the building. Captain Frank Kolodziej, Captain Daniel Dowling, and Private Ron Gonzerowski entered the building. Captain Kolodziej went up the stairs and found Rana collapsed between the third and second floors. Captains Kolodziej and Dowling carried Rana, who was badly burned, outside to the ambulance.

The firefighters returned to the building and found Singhal dead in the bathtub of apartment 3–C. At approximately 6:15 a.m., the firefighters were able to enter apartment 1–C. Captain Felipe Castillo located Christy's body face down in a fetal position on her bed. When the firefighters removed Christy's body from the apartment, Captain Castillo saw Allen wearing a clean white shirt and noticed that Allen did not appear to be distraught. Near the same time, East Chicago firefighter Jessie Barrera entered the bathroom of apartment 1–C and found Christy's dog, which was dead. Later in the morning, firefighters located Javonae's body and her car seat in the bedroom closet under two feet of debris.

Between 6:30 and 7:00 a.m., police officers had to restrain Allen, who was attempting to reenter the apartment. Allen was eventually handcuffed and placed in the back of a police car to prevent him from entering the building. Officer Joseph Grisafi noticed that Allen did not smell of smoke and was wearing clean clothes. Allen told Officer Grisafi that he and Christy had gone out drinking the night before and returned home at 4:00 a.m., that he placed Javonae in her car seat on the bed next to Christy, and that he fell asleep while watching a movie. Allen also said that Christy led him outside

after smelling smoke, that Christy went back into the apartment to get the baby, and that he attempted to go back into the apartment a few minutes later but the fire prevented him from doing so.

When Christy's family arrived at the scene, Allen told them that "he lost his clothes, his money, his shoes, he said he lost everything." *Id.* at 1342. He complained about some minor bruises and marks on his arms that he said were the result of the police restraining him.

On July 3, 2005, Okwei called Allen. Allen, who was staying with his father, told Okwei, "I need you to come and get me from where I am right now, I need to get out of here." *Id.* at 717. Allen said, "didn't you get the message that I left for you?" *Id.* at 718. When Okwei responded that he had not received the message, Allen said, "Monster and Javonae are dead." *Id.* When Okwei arrived at Allen's father's house, Allen explained to Okwei that Allen had been drinking and fell asleep, that Christy woke him up and led him outside, and that Christy went back inside to get the baby. Allen said that he tried to go back into the apartment, but the fire exploded and threw him out. Allen said that the police kept grabbing him and prevented him from getting Christy and the baby. Allen showed Okwei scrapes on his hands that he claimed resulted from the struggle with the police.

After the fire, Christy's mother went to Allen's father's house to write the obituaries. Allen was drinking and did not help write the obituaries. A few days after the funeral, Allen arrived at Christy's mom's home. He told her that any insurance money as a result of the fire and deaths would go to him. Christy's mother was only thinking about the fact that her child was dead and not the insurance money. Allen later received a payment of $4461.09 from Christy's profit sharing account through her employer, but he never paid the bill from the funeral home. Two or three weeks after the funeral, Allen invited Okwei and his girlfriend to go out for supper with Allen and Rivera.

Autopsies revealed that Christy, Javonae, and Singhal died of smoke inhalation and extensive burns. Christy also had a blood alcohol level of 0.13%. Rana sustained burns on over ninety percent of his body. He was in a drug-induced coma for four months. He had thirty-four skin graft surgeries at the University of Chicago Hospital Burn Unit, where he stayed until January 2006. He then had another twenty-six surgical procedures at the Wishard Hospital Burn Unit in Indianapolis. Rana's rehabilitation was extremely painful, and he contemplated suicide "probably every day" for the first year. *Id.* at 204. Some of his toes were amputated as a result of the burns, and an artificial elbow was placed in his right arm. He completed rehabilitation in May 2008.

Kevin Margraf, chief fire inspector for the Hammond Fire Department, investigated the cause of the fire at Tanglewood Drive. Numerous other investigators, including Steve Shand, a private fire investigator hired by State Farm Insurance, Scott Jones from Engineering Investigation, LLC, and Michael Hill from Donan Engineering, also examined the building and investigated the cause of the fire. Based upon the burn patterns, Margraf determined that the fire originated in apartment 1–C. The investigation initially focused on the stove as a possible source for the fire due to burn patterns on the walls around the stove and above the stove. The investigators thought that perhaps the stove had been left on or malfunctioned after the Allens heated a baby bottle. However, during an interview, Allen informed Margraf that they usually heated the baby's bottle up with hot tap water and

that they did not use the microwave or stove to heat the bottle.

The stove was removed and examined by electrical engineers. Jones determined that the front left burner of the stove was turned on in the high position. The investigators eliminated all electrical components, such as switches, conduit, wires, appliances, and outlets as causes of the fire. The investigators also eliminated the possibility of a "flashover" in the apartment.[2] Hill inventoried all smoke detectors in the building. He was unable to locate the smoke detector from the hallway outside of apartment 1–C. The smoke detector in apartment 1–C was found melted into the carpet without a visible battery.

Later, debris was removed from the apartment and the concrete floor was washed. In the living room, dining room, and kitchen, the investigators discovered burn patterns that are typically associated with the use of a liquid accelerant. The burn patterns on the floor "blocked all entrances to the apartment." *Id.* at 2372. Shand took core samples of the concrete floor in the living room, which revealed the presence of gasoline. The investigators determined that the fire had been intentionally set in apartment 1–C.

In 2006, a grand jury indicted Allen for three counts of murder in the perpetration of arson, arson as a Class A felony, and arson as a Class B felony. At the jury trial, Margraf, Shand, and Hill testified that the fire was intentionally set. Margraf also believed that Allen could not have tried to open the front door of apartment 1–C without burning his hand.

Allen testified and admitted that the fire started in his apartment, but he denied that he started it. Allen testified that

Christy woke him, led him out of the apartment, and went back to get Javonae. Allen claimed that he tried to go back into the apartment to save Christy and the baby but that the heat was too intense and blew him back. Allen's expert witness, John Lentini, testified that the fire started in the kitchen on the stove and then spread to the living room. Lentini testified that the burn patterns on the living room floor were the result of a normal fire and that the gasoline could have been in the concrete long before the fire.

The jury found Allen guilty as charged. At the sentencing hearing, the trial court found Allen's criminal history and the nature and circumstances of the crime as aggravating factors. The trial court found no mitigating factors. Due to double jeopardy concerns, the trial court did not sentence Allen for Class B felony arson. The trial court sentenced Allen to consecutive sentences of sixty years for each of the three counts of murder and forty years for the Class A felony arson conviction, for an aggregate sentence of 220 years.

## Analysis

### I. Admission of Photographs

Allen argues that the trial court abused its discretion by admitting photographs during Shand's testimony that contained captions. We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Helsley v. State,* 809 N.E.2d 292, 296 (Ind.2004). We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State,* 678 N.E.2d 386, 390 (Ind.1997). Photographs, as with all relevant evidence, may only be excluded

---

**2.** Shand described a "flashover" as a fire phenomenon in which the "unburned products of combustion and the heat from the fire" are "trapped in a compartment" and reach a certain temperature at which "all components within the room ... ignite simultaneously." Tr. p. 2329, 2350.

if their probative value is substantially outweighed by the danger of unfair prejudice. *Helsley,* 809 N.E.2d at 296. Admission of cumulative evidence alone is insufficient to warrant a new trial. *Id.*

Allen's argument concerns State's Exhibits 137 through 221, which are photographs of the building and fire damage. Each of the photographs has a caption. For example, the caption on State's Exhibit 137 reads, "East side of apartment building as viewed southeast," while the caption on State's Exhibit 190 reads, "Living room floor of Apartment 1C after having been cleared of fire debris and washed with clean water, viewed from the south entry door (arrows denote liquid accelerant burn patterns)." State's Exhibit 137, 190. Allen objected to the captions on the photographs, and the trial court overruled his objection.

On appeal, Allen argues that the "drumbeat repetition" of Shand's opinion prejudiced him. Appellant's Br. p. 15. In particular, Allen objects to the captions that include the phrase "arrows denote liquid accelerant burn patterns." *Id.* We conclude that any error in the admission of the photographs with the captions was harmless. Shand testified extensively regarding the photographs and the burn patterns. Moreover, Shand, Margraf, and Hill each testified repeatedly about the burn patterns on the living room floor, which they concluded were indicative of the use of liquid accelerant. Further, the core samples of the concrete in the living room revealed the presence of gasoline. The captions regarding the liquid accelerant burn patterns were merely cumulative of the testimony. Allen has failed to demonstrate how he was prejudiced.

## II. Evidence of Extramarital Affair

Allen argues that the trial court abused its discretion by admitting evidence of his extramarital affair with Rivera. Indiana Evidence Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

In assessing the admissibility of 404(b) evidence, we determine whether the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act, and we balance the probative value of the evidence against its prejudicial effect. *Spencer v. State,* 703 N.E.2d 1053, 1055–56 (Ind.1999). The trial court has discretionary power on the admission of evidence, and we review such decisions for an abuse of that discretion. *Wilson v. State,* 765 N.E.2d 1265, 1270 (Ind.2002).

The State argues that evidence of Allen's extramarital affair with Rivera was offered to establish proof of his motive. "With respect to the motive 'exception' in Evidence Rule 404(b), our supreme court has said that motive is 'always relevant' when proving a crime." *Camm v. State,* 812 N.E.2d 1127, 1131 (Ind.Ct.App.2004) (citing *Ross v. State,* 676 N.E.2d 339, 346 (Ind.1996)), *trans. denied.* "It is clear, however, that just because motive is 'always relevant,' this does not mean the State can introduce questionable character evidence simply by labeling it evidence of 'motive.'" *Id.* "If the State's claim of relevance to motive is too strained and remote to be reasonable, then the extrinsic act evidence is inadmissible." *Id.*

Allen argues that the evidence was inadmissible under *Camm.* There, the defendant was charged with the murder of his wife and two children, and the State presented extensive evidence of the defendant's extramarital affairs and attempts to

engage in extramarital affairs. On appeal, we concluded that "evidence of a defendant's marital infidelity is not automatically admissible as proof of motive in a trial for murder or attempted murder of the defendant's spouse." *Id.* at 1133. "Instead, to be admissible as proof of motive, the State must do more than argue that the defendant must have been unhappily married or was a poor husband or wife, ergo he or she had a motive to murder his or her spouse." *Id.* "Rather, to be admissible, evidence of a defendant's extramarital affairs should be accompanied by evidence that such activities had precipitated violence or threats between the defendant and victim in the past, or that the defendant was involved in an extramarital relationship at the time of the completed or contemplated homicide." *Id.* "The admissibility of such evidence may be further constrained by concerns of chronological remoteness, insufficient proof of the extrinsic act, or the general concern that the unfair prejudicial effect of certain evidence might substantially outweigh its probative value in a particular case." *Id.*

We concluded in *Camm* that the evidence of defendant's extramarital affairs was inadmissible where there was no evidence that the defendant was involved in an extramarital affair at the time of the murders and there was no evidence of hostilities or threats between the defendant and his wife. We concluded that the evidence had minimal probative value as proof of motive and its prejudicial effect substantially outweighed its value.

Here, over Allen's objection, the State presented evidence that he had been involved in an extramarital affair with Rivera, his former co-worker, since early 2004. On about June 13, 2005, Okwei rode with Allen to Rivera's house, but she was not at home. On the drive, Allen told Okwei that Rivera wanted him to leave

Christy and that Rivera wanted him to go to Florida with her on July 2, 2005, which was the date of the fire in apartment 1–C. During his testimony, Allen admitted to having an affair with Rivera. Further, two or three weeks after the funeral, Allen invited Okwei and his girlfriend to go out for supper with Allen and Rivera.

Unlike in *Camm*, the State presented evidence that Allen was engaged in an extramarital affair with Rivera at the time of Christy and Javonae's deaths. In conjunction with this evidence, the State also presented evidence that Allen referred to Christy as "monster" and three-month-old Javonae as a "hollering, greedy mother f* * *er." *Id.* at 1328. Allen, who never wanted to have children, was unhappy taking care of Javonae even though he was unemployed and Christy was working the night shift. Okwei testified that, in May or early June 2005 and again on June 13, 2005, Allen complained to him about their bills, the baby keeping him awake at night, and taking care of Christy's dog. On about June 13, 2005, Allen told Okwei that he was "going to kill somebody close to [him]." Tr. p. 704. Allen also told Okwei that "he wanted to be a paid assassin." *Id.* at 705. On the evening before the fire, Allen was upset with Christy because she went shopping and bought items for the baby.

The State's evidence regarding Allen's extramarital affair, Allen and Christy's financial problems, and Allen's unhappiness over caring for Javonae explained Allen's motive for killing Christy and Javonae. We conclude that the evidence of Allen's extramarital affair, which was ongoing at the time of Christy and Javonae's deaths, was relevant to his motive. Further, the probative value of the evidence substantially outweighed its prejudicial effect. The trial court did not abuse its discretion by

admitting the evidence of Allen's extra-marital affair.

### III. Jury Instruction

■ Allen also argues that fundamental error occurred due to the lack of a limiting instruction regarding the evidence of Allen's extramarital affair. According to Allen, "[t]he absence of a limiting instruction admonishing the jury creates the great probability that the challenged extrinsic evidence was received to promote the bad character of Allen." Appellant's Br. p. 11. Allen does not identify exactly what limiting instruction the trial court should have given.

■ Fundamental error makes a fair trial impossible or constitutes a clearly blatant violation of basic and elementary principles of due process so as to present an undeniable and substantial potential for harm. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind.2006). We have held that the trial court did not abuse its discretion by admitting the evidence of Allen's extramarital affair as proof of his motive to kill Christy and Javonae. The probative value of that evidence substantially outweighed its prejudicial effect. Further, given the extensive amount of evidence presented in this case, we are satisfied that the lack of an instruction limiting the use of the evidence to show Allen's bad character did not make "a fair trial impossible" here. *Id.* We conclude that no fundamental error occurred when the trial court did not sua sponte give the jury a limiting instruction regarding the extramarital affair.

### IV. Sufficiency of the Evidence

■ Next, Allen challenges the sufficiency of the evidence supporting his convictions. In particular, Allen argues that the evidence was insufficient to show that the fire was intentional rather than accidental. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind.2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id.* We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id.*

Allen was convicted of three counts of murder in the perpetration of arson for the deaths of Christy, Javonae, and Singhal. The offense of murder is governed by Indiana Code Section 35–42–1–1, which provides: "A person who: ... (2) kills another human being while committing or attempting to commit arson ... commits murder, a felony." Allen was also convicted of arson as a Class A felony for setting the fire that damaged Rana's dwelling and resulted in serious bodily injury to Rana. The offense of arson is governed by Indiana Code Section 35–43–1–1(a), which provides:

> A person who, by means of fire, explosive, or destructive device, knowingly or intentionally damages:
>
> (1) a dwelling of another person without the other person's consent;
>
>    \*    \*    \*    \*    \*    \*
>
> commits arson, a Class B felony. However, the offense is a Class A felony if it results in either bodily injury or serious bodily injury to any person other than a defendant.

Allen argues that the fire was accidental and that this case was a classic case of a "battle of the experts." Appellant's Br. p. 13. The State presented evidence that Allen did not want to have children and, even though he was unemployed, he did not want to watch Javonae while Christy worked. He referred to Javonae as a "hol-

lering, greedy mother f* * *er" and complained that she interfered with his sleep. Tr. p. 1328. He had been having an affair with Rivera since early 2004, and he told Okwei that Rivera wanted him to go to Florida with her on July 2, 2005, and wanted him to leave Christy. In mid-June 2005, Allen told Okwei that he was "going to kill somebody close to [him]." *Id.* at 704.

On the evening of July 1, 2005, Allen was upset with Christy because she went shopping and bought clothes for Javonae. At approximately 4:30 a.m. on July 2, 2005, a fire started in the Allens' apartment. Allen, who said he was sleeping in the living room, claimed that Christy woke him up, led him outside, and went back inside to get Javonae. Allen claimed that after a few minutes, he tried to go back into the apartment but was blown back by the fire.

As other tenants of the building woke to the smell of smoke and tried to escape the burning building, Allen stood near the patio to his apartment and made no attempt to rescue Christy and Javonae or the other tenants. Allen told Capolillo that he "couldn't believe they wouldn't let him in there to get his family." *Id.* at 483. However, Capolillo saw no one near Allen, and no one was stopping Allen from going in the building. While Carter rescued the Miller family, he was able to stand near the bedroom window to apartment 1–C. Allen made no attempt to rescue Christy and Javonae through that window.

As they tried to escape, some tenants burned their hands while trying to open their doors, and some were covered in black soot just from walking through the stairway. Witnesses saw that Allen suffered no burns or other injuries, and he was wearing a clean white tee shirt and blue jeans and did not smell of smoke. Margraf also testified that Allen could not have tried to open the front door of apartment 1–C without burning his hand. The first police officers on the scene noticed that Allen was "very mellow ... very calm." *Id.* at 841.

The physical evidence was inconsistent with Allen's explanations. In particular, although Allen claimed that Christy had led him out of the building, her body was found face down in a fetal position on her bed, and Javonae's body and her car seat were found in the bedroom closet. Numerous fire investigators examined the apartment building, including Margraf, chief fire inspector for the Hammond Fire Department, Shand, a private fire investigator hired by State Farm Insurance, Jones from Engineering Investigation, LLC, and Hill from Donan Engineering. The investigators determined that the fire originated in apartment 1–C, which was Allen's apartment, and Allen concedes that the fire originated there. Apartment 1–C sustained extensive fire damage to the dining room, kitchen, and living room, where Allen claimed to be sleeping until Christy woke him and led him out of the apartment.

The evidence pointing to an intentionally set fire is substantial. Jones determined that the front left burner of the stove was turned on in the high position. However, the investigators eliminated all electrical components, such as switches, conduit, wires, appliances, and outlets as causes of the fires. The investigators were unable to locate the smoke detector from the hallway outside of apartment 1–C, and the smoke detector in apartment 1–C was found melted into the carpet without a visible battery. On the concrete floor in the living room, dining room, and kitchen, the investigators discovered burn patterns that were typically associated with the use of a liquid accelerant. The burn patterns on the floor "blocked all entrances to the apartment." *Id.* at 2372. Core samples of

the concrete floor in the living room revealed the presence of gasoline.

Allen's expert, Lentini, testified that the fire started in the kitchen on the stove and then spread to the living room as a result of a flashover. Lentini testified that the burn patterns on the living room floor were the result of a normal fire and that the gasoline could have been in the concrete long before the fire. However, the jury gave more weight to the State's numerous experts, who actually examined the scene and the appliances and testified that no flashover had occurred in the apartment. Allen's argument is merely a request that we reweigh the evidence and judge the credibility of the witnesses, which we cannot do.

We conclude that the State presented overwhelming evidence that Allen intentionally started the fire in apartment 1–C. The evidence is sufficient to sustain his convictions.

## V. Sentence

■ Allen argues that his sentence is inappropriate in light of the nature of the offenses and the character of the offender. The trial court sentenced Allen to consecutive sentences of sixty years for each of the three counts of murder and forty years for the Class A felony arson conviction, for an aggregate sentence of 220 years. Allen argues that we should revise his consecutive sentences to be concurrent, resulting in a sixty-year sentence.

■ Indiana Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." When considering whether a sentence is inappropriate, we need not be "extremely" deferential to a trial court's sentencing decision. *Ruth-*

*erford v. State,* 866 N.E.2d 867, 873 (Ind. Ct.App.2007). Still, we must give due consideration to that decision. *Id.* We also understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Id.* Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind.2006).

The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State,* 895 N.E.2d 1219, 1225 (Ind.2008). We "should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id.*

The nature of the offenses is horrific. Allen set fire to his living room, dining room, and kitchen with gasoline, leaving his wife and baby in the apartment to die. The burn patterns on the concrete floor showed that he blocked all entrances to the apartment. Although he could have attempted to save Christy and Javonae through the bedroom window, he did not do so. Instead, he watched as the fire engulfed the apartment and the building. Terrified tenants tried to escape the rapidly escalating fire, but the tenants of apartment 3–C, which was two floors above Allen's apartment, found all exits blocked. Singhal died in the fire, and Rana sustained extensive burns. The trial court described Allen's crimes as "heinous," and we must agree. Tr. p. 4295.

An analysis of Allen's character is also unpersuasive to Allen's argument. Allen had juvenile adjudications for auto theft and trespass and an adult criminal history

of theft as Class A misdemeanor, dealing in cocaine as a Class A felony, conversion as a Class A misdemeanor, operating a vehicle while intoxicated as a Class C misdemeanor, and creating a disturbance as a misdemeanor in Michigan. The State presented evidence during the trial that Allen commonly referred to his wife, Christy, as "Monster" and that he referred to three-month-old Javonae as a "hollering, greedy mother f* * *er." *Id.* at 1328. Allen, although unemployed, did not want to watch Javonae while Christy worked and supported the family. Allen had been having an extramarital affair since early 2004, and went on a double-date with his girlfriend only a few weeks after Christy's death. Finally, we note the trial court's statement at the sentencing hearing, where the trial court stated: "Mr. Allen maintains his innocence, as is his right, but I would be remiss if I did not comment upon what I perceive to be a great deal of arrogance on his part and even hostility." *Id.* at 4296.

We reject Allen's request that we revise his sentence to sixty years. Given the horrific nature of Allen's crimes and his poor character, we conclude that the 220-year sentence, which was not the maximum allowable sentence, is not inappropriate in light of the nature of the offense and the character of the offender.

### Conclusion

The trial court did not abuse its discretion by admitting photographs of the building and fire damage that had captions or by admitting evidence of Allen's extramarital affair as proof of motive. Further, no fundamental error occurred by the lack of a limiting instruction regarding the extramarital affair. We conclude that the evidence was sufficient to sustain Allen's convictions, and his 220-year sentence is not inappropriate in light of the nature of the

offense and the character of the offender. We affirm.

Affirmed.

BAILEY, J., and MAY, J., concur.